[No. S134543. May 31, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
MARJORIE KNOLLER, Defendant and Appellant.

## COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Amy Haddix, Deputy Attorneys General, for Plaintiff and Appellant.

Dennis Patrick Riordan, under appointment by the Supreme Court, Riordan & Horgan, Donald M. Horgan and Dylan Schaffer for Defendant and Appellant.

## Opinion

KENNARD, J.—On January 26, 2001, two dogs owned by defendant Marjorie Knoller and her husband, codefendant Robert Noel, attacked and killed Diane Whipple in the hallway of an apartment building in San Francisco. Defendant Knoller was charged with second degree murder (Pen. Code, § 189)[1] and involuntary manslaughter (§ 192, subd. (b)); codefendant Noel, who was not present at the time of the attack on Whipple, was charged with involuntary manslaughter but not murder. Both were also charged with owning a mischievous animal that caused the death of a human being, in violation of section 399.

After a change of venue to Los Angeles County, a jury convicted defendants on all counts. Both moved for a new trial. (See § 1181, subd. 6 [a trial court may grant a new trial when "the verdict or finding is contrary to law or evidence"].) The trial court denied Noel's motion. It granted Knoller's motion in part, giving her a new trial on the second degree murder charge, but denying her motion for a new trial on the other two crimes of which she was convicted (involuntary manslaughter and possession of a mischievous animal that causes death).

With respect to Knoller, whose conviction of second degree murder was based on a theory of implied malice, the trial court took the position that, to be guilty of that crime, Knoller must have known that her conduct involved *a high probability of resulting in the death of another*. Finding such awareness lacking, the trial court granted Knoller's motion for a new trial on the second degree murder conviction.

The trial court sentenced both defendants to four years' imprisonment, the maximum term for involuntary manslaughter (§ 193, subd. (b)), staying the sentences for the section 399 violations. Defendants appealed from their convictions, and the People appealed from the order granting Knoller a new trial on the murder count. The Court of Appeal consolidated the appeals.

The Court of Appeal reversed the trial court's order granting Knoller a new trial on the second degree murder charge. It remanded the case to the trial court for reconsideration of the new trial motion in light of the Court of Appeal's holding that implied malice can be based simply on a defendant's conscious disregard of the risk of *serious bodily injury to another*. In all other respects, the Court of Appeal affirmed the convictions of both defendants.

---

[1] All further statutory citations are to the Penal Code.

Both defendants petitioned this court for review. We granted only Knoller's petition, limiting review to two questions: "(1) Whether the mental state required for implied malice includes only conscious disregard for human life or can it be satisfied by an awareness that the act is likely to result in great bodily injury,"[2] and "(2) Whether the trial court abused its discretion in granting Knoller's motion for new trial under Penal Code section 1181[, subdivision 6]."

With respect to the first issue, we reaffirm the test of implied malice we set out in *People v. Phillips* (1966) 64 Cal.2d 574 [51 Cal.Rptr. 225, 414 P.2d 353] and, as mentioned on page 152, *post*, reiterated in many later cases: Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Phillips, supra*, at p. 587.) In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less.

Measured against that test, it becomes apparent that the Court of Appeal set the bar too low, permitting a conviction of second degree murder, based on a theory of implied malice, if the defendant knew his or her conduct risked causing death *or serious bodily injury*. But the trial court set the bar too high, ruling that implied malice requires a defendant's awareness that his or her conduct had a *high probability* of resulting in death, and that granting defendant Knoller a new trial was justified because the prosecution did not charge codefendant Noel with murder. Because the trial court used an incorrect test of implied malice, and based its decision in part on an impermissible consideration, we conclude that it abused its discretion in granting Knoller a new trial on the second degree murder count. It is uncertain whether the court would have granted the new trial had it used correct legal standards. We therefore remand the matter to the Court of Appeal, and direct it to return the case to the trial court with directions to reconsider defendant Knoller's new trial motion in light of the views set out in this opinion.

---

[2] Our order limiting the issues referred to "great bodily injury," but the Court of Appeal decision referred to "serious bodily injury." The two terms are " 'essentially equivalent' " (*People v. Burroughs* (1984) 35 Cal.3d 824, 831 [201 Cal.Rptr. 319, 678 P.2d 894]), and although there are some differences in the statutory definitions (compare § 243, subd. (f)(4) [defining "serious bodily injury"] with § 12022.7, subd. (f) [defining "great bodily injury"]), those differences are immaterial here.

## I. Facts and Proceedings

In 1998, Pelican Bay State Prison inmates Paul Schneider and Dale Bretches, both members of the Aryan Brotherhood prison gang, sought to engage in a business of buying, raising, and breeding Presa Canario dogs. This breed of dog tends to be very large, weighing over 100 pounds, and reaching over five feet tall when standing on its hind legs. A document found in defendants' apartment describes the Presa Canario as "a gripping dog . . . [¶] . . . always used and bred for combat and guard . . . [and] used extensively for fighting . . . ."

Prisoners Schneider and Bretches relied on outside contacts, including Brenda Storey and Janet Coumbs, to carry out their Presa Canario business. Schneider told Coumbs that she should raise the dogs.

As of May 1990, Coumbs possessed four such dogs, named Bane, Isis, Hera, and Fury. Hera and Fury broke out of their fenced yard and attacked Coumbs's sheep. Hera killed at least one of the sheep and also a cat belonging to Coumbs's daughter. Coumbs acknowledged that Bane ate his doghouse and may have joined Fury in killing a sheep.

Defendants Knoller and Noel, who were attorneys representing a prison guard at Pelican Bay State Prison, met inmate Schneider at the prison sometime in 1999. In October 1999, defendants filed a lawsuit on behalf of Brenda Storey against Coumbs over the ownership and custody of the four dogs. Coumbs decided not to contest the lawsuit and to turn the dogs over to defendants. Coumbs warned Knoller that the dogs had killed Coumbs's sheep, but Knoller did not seem to care.

Defendant Knoller thereafter contacted Dr. Donald Martin, a veterinarian for 49 years, and on March 26, 2000, he examined and vaccinated the dogs. With his bill to Knoller, Dr. Martin included a letter, which said in part: "I would be professionally amiss [sic] if I did not mention the following, so that you can be prepared. These dogs are huge, approximately weighing in the neighborhood of 100 pounds each. They have had no training or discipline of any sort. They were a problem to even get to, let alone to vaccinate. You mentioned having a professional hauler gather them up and taking them. . . . Usually this would be done in crates, but I doubt one could get them into anything short of a livestock trailer, and if let loose they would have a battle. [¶] To add to this, these animals would be a liability in any household, reminding me of the recent attack in Tehama County to a boy by large dogs.

He lost his arm and disfigured his face. The historic romance of the warrior dog, the personal guard dog, the gaming dog, etc. may sound good but hardly fits into life today." Knoller thanked Dr. Martin for the information and said she would pass it on to her client.

On April 1, 2000, both defendants and a professional dog handler took custody of the dogs from Coumbs. Bane then weighed 150 pounds and Hera 130 pounds. Coumbs told both defendants that she was worried about the dogs, that Hera and Fury should be shot, and that she was also concerned about Bane and Isis.

Hera remained for a short time at a kennel in San Mateo County while Bane was sent to a facility in Los Angeles County. Both defendants soon became concerned for the health of the two dogs. On April 30, 2000, defendants brought Hera to their sixth-floor apartment at 2398 Pacific Avenue in San Francisco. Bane arrived in September 2000. Codefendant Noel purchased dog licenses, registering himself and Knoller as the dogs' owners.

A later search of defendants' apartment showed that they frequently exchanged letters with Pelican Bay inmates Schneider and Bretches. Over 100 letters were sent and received between March and December 2000, apparently under the guise of attorney-client correspondence.[3] In the letters, defendants discussed a commercial breeding operation, considering various names such as GuerraHund Kennels, Wardog, and finally settling on Dog-O-War. Prisoners Schneider and Bretches's notes on a Web site for the business described Bane as "Wardog," and "Bringer of Death: Ruin: Destruction."

Between the time defendants Noel and Knoller brought the dogs to their sixth-floor apartment in San Francisco and the date of the fatal mauling of Diane Whipple on January 26, 2001, there were about 30 incidents of the two dogs being out of control or threatening humans and other dogs. Neighbors mentioned seeing the two dogs unattended on the sixth floor and running down the hall. Codefendant Noel's letters to prisoner Schneider confirmed this, mentioning one incident when defendant Knoller had to let go of the two dogs as they broke from her grasp and ran to the end of the hall. Noel

---

[3] The trial court ruled that letters written by or addressed to codefendant Noel were admissible against defendant Knoller, and vice versa, on a theory that raising the Presa Canario dogs was a joint enterprise. The Court of Appeal rejected defendants' challenge to this ruling. Both defendants raised the issue in their respective petitions for review. We denied Noel's petition, and in granting Knoller's petition we limited review to other issues.

described how the dogs even pushed past him and "took off side by side down the hall toward the elevator in a celebratory stampede!! 240 lbs. of Presa wall to wall moving at top speed!!!" In a letter to inmate Schneider, defendant Knoller admitted not having the upper body strength to handle Bane and having trouble controlling Hera.

When neighbors complained to defendants Noel and Knoller about the two dogs, defendants responded callously, if at all. In one incident, neighbors Stephen and Aimee West were walking their dog in a nearby park when Hera attacked their dog and "latched on" to the dog's snout. Noel was unable to separate the dogs, but Aimee threw her keys at Hera, startling Hera and causing Hera to release her grip on the Wests' dog. On another day, Stephen West was walking his dog when he encountered Noel with Bane. Bane lunged toward West's dog, but Noel managed to pull Bane back. When Stephen West next saw Noel, West suggested that Noel muzzle the dogs and talk to dog trainer Mario Montepeque about training them; Noel replied there was no need to do so. Defendants Knoller and Noel later encountered Montepeque, who advised defendants to have their dogs trained and to use a choke collar. Defendants disregarded this advice. On still another occasion, when dog walker Lynn Gaines was walking a dog, Gaines told Noel that he should put a muzzle on Bane; Noel called her a "bitch" and said the dog Gaines was walking was the problem.

There were also instances when defendants' two dogs attacked or threatened people. David Moser, a fellow resident in the apartment building, slipped by defendants Knoller and Noel in the hallway only to have their dog Hera bite him on the "rear end." When he exclaimed, "Your dog just bit me," Noel replied, "Um, interesting." Neither defendant apologized to Moser or reprimanded the dog. Another resident, Jill Cowen Davis, was eight months pregnant when one of the dogs, in the presence of both Knoller and Noel, suddenly growled and lunged toward her stomach with its mouth open and teeth bared. Noel jerked the dog by the leash, but he did not apologize to Davis. Postal carrier John Watanabe testified that both dogs, unleashed, had charged him. He said the dogs were in a "snarling frenzy" and he was "terrified for [his] life." When he stepped behind his mail cart, the dogs went back to Knoller and Noel. On still another occasion, the two dogs lunged at a six-year-old boy walking to school; they were stopped less than a foot from him.

One time, codefendant Noel himself suffered a severe injury to his finger when Bane bit him during a fight with another dog. The wound required surgery, and Noel had to wear a splint on his arm and have two steel pins placed in his hand for eight to 10 weeks.

Mauling victim Diane Whipple and her partner Sharon Smith lived in a sixth-floor apartment across a lobby from defendants. Smith encountered defendants' two dogs as often as once a week. In early December 2000, Whipple called Smith at work to say, with some panic in her voice, that one of the dogs had bitten her. Whipple had come upon codefendant Noel in the lobby with one of the dogs, which lunged at her and bit her in the hand. Whipple did not seek medical treatment for three deep, red indentations on one hand. Whipple made every effort to avoid defendants' dogs, checking the hallway before she went out and becoming anxious while waiting for the elevator for fear the dogs would be inside. She and Smith did not complain to apartment management because they wanted nothing to do with defendants Knoller and Noel.

On January 26, 2001, Whipple telephoned Smith to say she was going home early. At 4:00 p.m., Esther Birkmaier, a neighbor who lived across the hall from Whipple, heard dogs barking and a woman's "panic-stricken" voice calling, "Help me, help me." Looking through the peephole in her front door, Birkmaier saw Whipple lying facedown on the floor just over the threshold of her apartment with what appeared to be a dog on top of her. Birkmaier saw no one else in the hallway. Afraid to open the door, Birkmaier called 911, the emergency telephone number, and at the same time heard a voice yelling, "No, no, no" and "Get off." When Birkmaier again approached her door, she could hear barking and growling directly outside and a banging against a door. She heard a voice yell, "Get off, get off, no, no, stop, stop." She chained her door and again looked through the peephole. Whipple's body was gone and groceries were strewn about the hallway. Birkmaier called 911 a second time.

At 4:12 p.m., San Francisco Police Officers Sidney Laws and Leslie Forrestal arrived in response to Birkmaier's telephone calls. They saw Whipple's body in the hallway; her clothing had been completely ripped off, her entire body was covered with wounds, and she was bleeding profusely. Defendant Knoller and the two dogs were not in sight.

The officers called for an ambulance. Shortly thereafter, defendant Knoller emerged from her apartment. She did not ask about Whipple's condition but merely told the officers she was looking for her keys, which she found just inside the door to Whipple's apartment.

An emergency medical technician administered first aid to Whipple, who had a large, profusely bleeding wound to her neck. The wound was too large to halt the bleeding, and Whipple's pulse and breathing stopped as paramedics arrived. She was revived but died shortly after reaching the hospital.

An autopsy revealed over 77 discrete injuries covering Whipple's body "from head to toe." The most significant were lacerations damaging her jugular vein and her carotid artery and crushing her larynx, injuries typically inflicted by predatory animals to kill their prey. The medical examiner stated that although earlier medical attention would have increased Whipple's chances of survival, she might ultimately have died anyway because she had lost one-third or more of her blood at the scene. Plaster molds of the two dogs' teeth showed that the bite injuries to Whipple's neck were consistent with Bane's teeth.

Animal control officer Andrea Runge asked defendant Knoller to sign over custody of the dogs for euthanasia. Knoller, whom Runge described as "oddly calm," agreed to sign over Bane, but she refused to sign over Hera for euthanasia and she refused to help the animal control officers with the animals, saying she was "unable to handle the dogs." When tranquilizer darts malfunctioned and failed to quiet Bane, "come-along" poles were used by animal control officers backed up by officers with guns drawn. Hera too was controlled by officers with "come-along" poles.

On February 8, 2001, both defendants appeared on the television show *Good Morning America* and basically blamed mauling victim Whipple for her own death. Defendant Knoller claimed that Whipple had already opened her apartment door when something about her interested Bane. He broke away, pulled Knoller across the lobby, and jumped up on Whipple, putting his paws on either side of her. Knoller said she pushed Whipple into Whipple's apartment, fell on top of Whipple, and then tried to shield Whipple with her own body. But Whipple's struggles must have been misinterpreted by the dog, and when Whipple struck Knoller with her fist, the dog began to bite Whipple. Knoller claimed that Whipple had ample opportunity to just slam the door of her apartment or stay still on the floor.

Codefendant Noel did not testify, but he presented evidence of positive encounters between the two dogs and veterinarians, friends, and neighbors. Defendant Knoller did testify in her own defense. She referred to herself, her husband, and Pelican Bay prisoner Schneider as the "triad," and she spoke of Schneider as her "son." The two dogs had become a focal point in the relationship. She denied reading literature in the apartment referring to the vicious nature of the dogs. She thought the dogs had no personality problems requiring a professional trainer. She denied receiving or otherwise discounted any warnings about the two dogs' behavior and she maintained that virtually all the witnesses testifying to incidents with the dogs were lying. She said she never walked both dogs together. Ordinarily, she would walk Hera and codefendant Noel would walk Bane, because she had insufficient body strength to control Bane. But after Noel was injured while breaking up a fight

between Bane and another dog, Knoller would sometimes walk Bane, always on a leash. She said she had just returned from walking Bane on the roof of the apartment building, and had opened the door to her apartment while holding Bane's leash, when Bane dragged her back across the lobby toward Whipple, who had just opened the door to her own apartment. The other dog, Hera, left defendants' apartment and joined Bane, who attacked Whipple. Knoller said she threw herself on Whipple to save her. She denied that Hera participated in the attack. She acknowledged not calling 911 to get help for Whipple.

Asked whether she denied responsibility for the attack on Whipple, Knoller gave this reply: "I said in an interview that I wasn't responsible but it wasn't for the—it wasn't in regard to what Bane had done, it was in regard to knowing whether he would do that or not. And I had no idea that he would ever do anything like that to anybody. How can you anticipate something like that? It's a totally bizarre event. I mean how could you anticipate that a dog that you know that is gentle and loving and affectionate would do something so horrible and brutal and disgusting and gruesome to anybody? How could you imagine that happening?"

In rebuttal, the prosecution presented evidence that the minor character of defendant Knoller's injuries—principally bruising to the hands—indicated that she had not been as involved in trying to protect mauling victim Whipple as she had claimed. Dr. Randall Lockwood, the prosecution's expert on dog behavior, testified that good behavior by a dog on some occasions does not preclude aggressive and violent behavior on other occasions, and he mentioned the importance of training dogs such as Bane and Hera *not* to fight.

The jury found Knoller guilty of second degree murder; it also found both Knoller and Noel guilty of involuntary manslaughter and owning a mischievous animal that caused the death of a human being. Both defendants moved for a new trial. The trial court denied Noel's motion. We quote below the pertinent statements by the trial court in granting Knoller's motion for a new trial on the second degree murder count.

The trial court observed: "The law requires that there be a subjective understanding on the part of the person that on the day in question—and I do not read that as being January 26th, 2001 because by this time, with all of the information that had come out dealing with the dogs, the defendants were fully on notice that they had a couple of wild, uncontrollable and dangerous dogs that were likely going to do something bad. [¶] Is the 'something bad' death? That is the ultimate question in the case. There is no question but that the something bad was going to be that somebody was going to be badly hurt. I defy either defendant to stand up and tell me they had no idea that

those dogs were going to hurt somebody one day. *But can they stand up and say that they knew subjectively—not objectively and that's an important distinction—that these dogs were going to stand up and kill somebody?"* (Italics added.)

The trial court continued: "I am guided by a variety of principles. One of them is that public emotion, public outcry, feeling, passion, sympathy do not play a role in the application of the law. The other is that I am required to review all of the evidence and determine independently rather than as a jury what the evidence showed. I have laid out most of the evidence as it harms the defendants in this case. Their conduct from the time that they got the dogs to the time—to the weeks after Diane Whipple's death was despicable. . . .

"There was one time on the stand, Ms. Knoller, when I truly believed what you said. You broke down in the middle of a totally scripted answer and you actually, instead of crying, you actually got mad and you said you had no idea that this dog could do what he did and pounded the table. I believed you. That was the only time, but I did believe you." The court then described the definition of second degree murder as requiring that one *"subjectively knows, based on everything, that the conduct that he or she is about to engage in has a high probability of death to another human being."* (Italics added.)

The trial court went on: "What we have in this case as it relates to Ms. Knoller is the decision to take the dog outside, into the hallway, up to the roof, go to the bathroom, bring it back down and put it in the apartment. There was no question but that taking the dog out into the hallway by that very act exposed other people in the apartment, whether they are residents there or guests, invitees to what might happen with the dog. When you take everything as a totality, *the question is whether or not as a subjective matter and as a matter of law Ms. Knoller knew that there was a high probability that day, or on the day before on the day after,*—I reject totally the argument of the defendants that she had to know when she walked out the door—*she was going to kill somebody that morning. The Court finds that the evidence does not support it."* (Italics added.)

The trial court concluded it had "no choice, . . . taking the Legislature's scheme, the evidence that was received, as despicable as it is, but to determine not that [defendant Knoller] is acquitted of second degree murder but to find that on the state of the evidence, *I cannot say as a matter of law that she subjectively knew on January 26th that her conduct was such that a human being was likely to die."* (Italics added.)

The trial court mentioned another consideration: "The Court also notes a great troubling feature of this case that Mr. Noel was never charged [with

murder] as Ms. Knoller was. In the Court's view, given the evidence, Mr. Noel is more culpable than she. Mr. Noel personally knew that she could not control those dogs. He could not control those dogs. Mr. Noel was substantially haughtier than she was. In brushing off all of the incidents that happened out in the street, Mr. Noel knew as a theological certainty that that dog, which had recently been operated on, was taking medication that had given it diarrhea, was going to go out into the hallway or out into the street possibly, at the hands of Ms. Knoller. He . . . left her there to do that. [¶] . . . And yet Mr. Noel was not charged [with murder]. Equality of sentencing and the equal administration of justice is an important feature in any criminal court. That played a role as well." The trial court then granted defendant Knoller's motion for a new trial on the second degree murder count.

As noted earlier, both defendants as well as the prosecution appealed. The Court of Appeal reversed the trial court's order granting Knoller's motion for a new trial on the second degree murder count. It disagreed with the trial court that a second degree murder conviction, based on a theory of implied malice, required that Knoller recognized "her conduct was such that a human being was likely to die." The Court of Appeal held that a second degree murder conviction can be based simply on a defendant's "subjective appreciation and conscious disregard of a likely risk of . . . serious bodily injury." In all other respects, the Court of Appeal affirmed both defendants' convictions.

## II.   THE ELEMENTS OF IMPLIED MALICE

■   Murder is the unlawful killing of a human being, or a fetus, with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) At issue here is the definition of "implied malice."

■   Defendant Knoller was convicted of second degree murder as a result of the killing of Diane Whipple by defendant's dog, Bane. Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder. (See §§ 187, subd. (a), 189.) Section 188 provides: "[M]alice may be either express or implied. It is express when there is manifested a deliberate intention to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

The statutory definition of implied malice, a killing by one with an "abandoned and malignant heart" (§ 188), is far from clear in its meaning. Indeed, an instruction in the statutory language could be misleading, for it "could lead the jury to equate the malignant heart with an evil disposition or

a despicable character" (*People v. Phillips, supra*, 64 Cal.2d at p. 587) instead of focusing on a defendant's awareness of the risk created by his or her behavior. "Two lines of decisions developed, reflecting judicial attempts 'to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply.' " (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103 [13 Cal.Rptr.2d 864, 840 P.2d 969], quoting *People v. Protopappas* (1988) 201 Cal.App.3d 152, 162–163 [246 Cal.Rptr. 915].) Under both lines of decisions, implied malice requires a defendant's awareness of the risk of death to another.

The earlier of these two lines of decisions, as this court observed in *People v. Nieto Benitez, supra*, 4 Cal.4th at pages 103–104, originated in Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1], which stated that malice is implied when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (We here refer to this as the *Thomas* test.) The later line dates from this court's 1966 decision in *People v. Phillips, supra*, 64 Cal.2d at page 587: Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (The *Phillips* test.)

In *People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279], we held that these two definitions of implied malice in essence articulated the same standard. Concerned, however, that juries might have difficulty understanding the *Thomas* test's concept of "wanton disregard for human life," we later emphasized that the "better practice in the future is to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice," the definition articulated in the *Phillips* test. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1221 [264 Cal.Rptr. 841, 783 P.2d 200].) The standard jury instructions thereafter did so. (See CALJIC No. 8.11; Judicial Council of Cal. Crim. Jury Instns. (2006) CALCRIM No. 520.) Since 1989, our decisions have articulated the standard we set out in *Dellinger* and in CALJIC No. 8.11. (See, e.g., *People v. Randle* (2005) 35 Cal.4th 987, 994 [28 Cal.Rptr.3d 725, 111 P.3d 987]; *People v. Taylor* (2004) 32 Cal.4th 863, 867–868 [11 Cal.Rptr.3d 510, 86 P.3d 881]; *People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666]; *People v. Hansen* (1994) 9 Cal.4th 300, 308 [36 Cal.Rptr.2d 609, 885 P.2d 1022]; *People v. Whitfield* (1994) 7 Cal.4th 437, 450 [27 Cal.Rptr.2d 858, 868 P.2d 272]; *People v. Nieto Benitez, supra*, 4 Cal.4th at pp. 104, 111.) The trial court here instructed the jury in the language of CALJIC No. 8.11.

### III. The Court of Appeal's Test for Implied Malice

As discussed in the preceding part, the great majority of this court's decisions establish that a killer acts with implied malice only when acting with an awareness of *endangering human life*. This principle has been well settled for many years, and it is embodied in the standard jury instruction given in murder cases, including this one. The Court of Appeal here, however, held that a second degree murder conviction, based on a theory of implied malice, can be based simply on a defendant's awareness of the risk of causing *serious bodily injury* to another.

In support of that view, the Court of Appeal pointed to three decisions of this court: *People v. Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911] (*Conley*), *People v. Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342] (*Poddar*), and *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d 528, 2 P.3d 1081] (*Coddington*). We discuss each case below.

In *Conley, supra*, 64 Cal.2d 310, the defendant, after consuming copious quantities of alcohol, went to the home of his former lover and her husband, where he shot and killed both of them. He was convicted of two counts of first degree murder. The issue on appeal was whether the trial court should have instructed the jury on diminished mental capacity caused by intoxication. This court held that it should have so instructed because "[a]n awareness of the obligation to act within the general body of laws regulating society . . . is included in the statutory definition of implied malice in terms of the abandoned and malignant heart . . . ." (*Id.* at p. 322.) In explaining that holding, *Conley* stated that a person who carefully weighs the course of action he is about to take and chooses to kill his victim, after considering the reasons for and against it, "is normally capable also of comprehending the duty society places on all persons to act within the law." (*Ibid.*) *Conley* continued: "If, despite such awareness, he does an *act* that is likely to cause *serious injury or death* to another, he exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought." (*Ibid.*, italics added.)[4] It is this sentence from *Conley* on which the Court of Appeal relied. But that language from *Conley* described the defendant's *act* (the objective component of implied malice), not the defendant's *mental state* (the subjective component of implied malice); it is therefore irrelevant to the issue here, which concerns the subjective component—whether the defendant must be aware of the risk of death or only a risk of serious bodily injury.

---

[4] In *People v. Flannel* (1979) 25 Cal.3d 668, 679 [160 Cal.Rptr. 84, 603 P.2d 1], we quoted that passage from *Conley, supra*, 64 Cal.2d 310 at page 322, in summarizing the doctrine of diminished capacity; we then explained how imperfect self-defense—the issue in *Flannel*—differed from diminished capacity. Not at issue in *Flannel* was the distinction between a defendant's awareness of the risk of serious bodily injury and awareness of the risk of death.

*Conley, supra,* 64 Cal.2d 310, did not discuss whether implied malice could be based merely on a defendant's awareness of the risk of serious bodily injury to another but not the risk of death resulting from the defendant's actions. That issue, presented here, did not arise in *Conley,* because there the defendant, who said he was going to kill the victims and did so, could not claim he was aware only of the risk of causing serious bodily injury.

In cases decided shortly before and after *Conley,* we reiterated the established definition of implied malice as requiring an awareness of the risk that the defendant's conduct will result in the *death* of another. One year before *Conley* was filed, we stated in *People v. Washington* (1965) 62 Cal.2d 777, 780, 782 [44 Cal.Rptr. 442, 402 P.2d 130], that implied malice required a "conscious disregard for life." *Conley* did not at all suggest that it intended to depart from the view expressed in *Washington.* And two months after *Conley,* this court in *People v. Phillips, supra,* 64 Cal.2d at page 582, endorsed its earlier statement in *Washington* that implied malice requires a "conscious disregard for *life.*" (Italics added.)

We now turn to *Poddar, supra,* 10 Cal.3d 750, the second of the three decisions that the Court of Appeal cited. In that case, the defendant went to the home of a woman he had dated casually, shot her with a pellet gun, and then killed her with a knife. He was convicted of second degree murder. This court held that the trial court's jury instruction on second degree murder was defective because it did not explain the concept of diminished capacity as set out in *Conley, supra,* 64 Cal.2d 310. (*Poddar, supra,* 10 Cal.3d at pp. 757–759.) In its discussion of diminished capacity, *Poddar* stated that to prove implied malice, "it must be shown that the accused was both aware of his duty to act within the law and acted in a manner likely to cause death *or serious bodily injury* despite such awareness." (*Id.* at p. 758, italics added.) As in *Conley, Poddar* referred to serious bodily injury in describing the defendant's act, the *objective* component of implied malice. *Poddar* did not say that the defendant's mental state, the *subjective* component of implied malice, at issue here, could be satisfied by proof that the defendant acted with an awareness that his conduct could cause serious bodily injury. Indeed, the defendant in *Poddar* never claimed that he was unaware that his acts could cause death.

Even if the above discussed language from *Conley, supra,* 64 Cal.2d at page 322, and from *Poddar, supra,* 10 Cal.3d at page 758, could be viewed as implying that a second degree murder conviction, on a theory of implied malice, could be based simply on a defendant's awareness of the risk of causing serious bodily injury, rather than death, that language would lack authoritative force. " 'It is axiomatic that language in a judicial opinion is to

be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered.' " (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680 [36 Cal.Rptr.3d 495, 123 P.3d 931], quoting *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].) "An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399].) Because the facts and issues in *Conley, supra*, 64 Cal.2d 310, and in *Poddar, supra*, 10 Cal.3d 750, did not encompass the question whether implied malice could be based on a defendant's awareness of the risk of serious bodily injury alone, the language the Court of Appeal cited from *Conley* and *Poddar* lacks authoritative force.

This brings us to *Coddington, supra*, 23 Cal.4th 529, the last in the trio of decisions relied on by the Court of Appeal. In that case, the defendant lured teenage girls to his mobilehome by telling them they would star in an antidrug video, and then raped them and committed other sexual offenses. He killed two older women who had accompanied the girls as chaperones. The defendant was convicted of two counts of first degree murder with special circumstances, as well as various other offenses, and he was sentenced to death.

Among the many issues the defendant in *Coddington* raised on appeal was a claim that the trial court had erred in not instructing the jury on second degree murder based on implied malice. Responding to that claim, the Attorney General argued in *Coddington* that such an instruction was not needed because there was no evidence that the defendant's offense was less than first degree murder, and that the defendant's conduct proved that he "acted with actual or presumptive knowledge that *serious bodily injury was likely to occur*." (*Coddington, supra*, 23 Cal.4th at p. 592, italics added.) This court rejected the Attorney General's argument, explaining that such a mental state (actual or presumptive knowledge that serious bodily injury is likely to occur) "permits an inference of implied malice . . . and does not support a conclusion that no instruction on second degree murder on a theory of implied malice was necessary." (*Ibid.*)

██ Notwithstanding *Coddington*'s offhand comment that knowledge of the risk of serious bodily injury permits an inference of implied malice, *Coddington* reiterated the established rule that a trial court must instruct on second degree murder based on implied malice whenever there is evidence "from which the jury could have inferred that appellant acted without intent to kill even though his conduct posed a high risk of *death*." (*Coddington, supra*, 23 Cal.4th at p. 593, italics added.) Thus, *Coddington*'s offhand comment cannot be viewed as implicitly overruling the decisions of this court

discussed earlier (see, *ante,* at p. 152) declaring that implied malice requires an awareness of the risk of death.

█ In sum, the three decisions on which the Court of Appeal relied lack persuasive force. Neither *Conley, supra,* 64 Cal.2d 310, nor *Poddar, supra,* 10 Cal.3d 750, addressed the issue presented here: whether implied malice can be based on a defendant's awareness of the risk of great bodily injury but not death resulting from the defendant's actions. With respect to the comment in *Coddington, supra,* 23 Cal.4th at page 592, suggesting that knowledge of the likelihood of serious bodily injury permits an inference of implied malice, it is inconsistent not only with the holding in that case but also with the views expressed in other decisions of this court. (See, *ante,* at p. 152.) We conclude that a conviction for second degree murder, based on a theory of implied malice, requires proof that a defendant acted with conscious disregard of the danger to human life. In holding that a defendant's conscious disregard of the risk of serious bodily injury suffices to sustain such a conviction, the Court of Appeal erred.

### IV. THE TRIAL COURT'S GRANT OF A NEW TRIAL ON THE SECOND DEGREE MURDER CHARGE

We now turn to the second issue raised by the petition for review—whether the trial court abused its discretion in granting defendant Knoller a new trial on the second degree murder charge. Such an abuse of discretion arises if the trial court based its decision on impermissible factors (see *People v. Carmody* (2004) 33 Cal.4th 367, 378 [14 Cal.Rtpr.3d 880, 92 P.3d 369]) or on an incorrect legal standard (see *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435–436 [97 Cal.Rptr.2d 179, 2 P.3d 27]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496 [146 Cal.Rptr. 623, 579 P.2d 514]).

In granting Knoller a new trial, the trial court properly viewed implied malice as requiring a defendant's awareness of the danger that his or her conduct will result in another's *death* and not merely in serious bodily injury. (See, *ante,* at pp. 149–151.) But the court's ruling was legally flawed in other respects. As we explain below, the trial court based its ruling on an inaccurate definition of implied malice, and it inappropriately relied on the prosecutor's failure to charge codefendant Noel with murder.

As discussed earlier in part II, this court before its decision in *People v. Dellinger, supra,* 49 Cal.3d 1212, had defined implied malice in two similar but somewhat different ways. Under the *Thomas* test, malice is implied when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (*People v. Thomas, supra,* 41 Cal.2d at p. 480 (conc. opn. of

Traynor, J.); see also *Poddar, supra*, 10 Cal.3d at pp. 756–757.) Under the *Phillips* test (*People v. Phillips, supra*, 64 Cal.2d at p. 587), malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " In *People v. Dellinger, supra*, 49 Cal.3d 1212, we observed that although these two tests "articulated one and the same standard" (*id.* at p. 1219), the *Thomas* test contained "obscure phraseology" and had "become a superfluous charge," so that the "better practice in the future" would be for trial courts to instruct juries in the "straightforward language" of the *Phillips* test (*Dellinger*, at p. 1221).[5]

Here, the trial court properly instructed the jury in accordance with the *Phillips* test. But when the court evaluated defendant Knoller's new trial motion, it relied on language from the *Thomas* test, and as explained below, its description of that test was inaccurate. The court stated that a killer acts with implied malice when the killer "*subjectively knows*, based on everything, that the conduct that he or she is about to engage in has a *high probability of death* to another human being" and thus the issue in this case was "whether or not as a *subjective* matter and as a matter of law Ms. Knoller *knew* that there was a *high probability*" that her conduct would result in someone's death. (Italics added.) But "high probability of death" is the *objective*, not the *subjective*, component of the *Thomas* test, which asks whether the defendant's act or conduct "involves a high degree of probability that it will result in death." (*People v. Thomas, supra*, 41 Cal.2d at p. 480 (conc. opn. of Traynor, J.).) The *subjective* component of the *Thomas* test is whether the defendant acted with "a base, antisocial motive and with wanton disregard for human life." (*Ibid.*) Nor does the *Phillips* test require a defendant's awareness that his or her conduct has a *high probability* of causing death. Rather, it requires only that a defendant acted with a " 'conscious disregard for human life' " (*People v. Dellinger, supra*, 49 Cal.3d at p. 1221; see *People v. Phillips, supra*, 64 Cal.2d at p. 587).

As just shown, in treating the objective component of the *Thomas* test as the subjective component of that test, the trial court applied an erroneous definition of implied malice in granting defendant Knoller a new trial on the second degree murder charge.

In ruling on Knoller's motion for a new trial, the trial court also commented that, in its view, codefendant Noel was more culpable than defendant Knoller, and that the district attorney's failure to charge Noel with

---

[5] For trial courts too, the better practice in the future would be to use the *Phillips* test, rather than the *Thomas* test, in ruling on motions for a new trial as well as other matters in which the definition of implied malice is in issue.

murder was a "troubling feature of this case" that "played a role as well" in the court's decision to grant Knoller a new trial on the second degree murder charge. Dissimilar charging of codefendants, however, is not among the grounds for a new trial in section 1181. Although section 1181 states that a defendant's new trial motion may be granted only on the grounds stated in that section, several courts have held that new trials may nonetheless be granted on grounds not enumerated in the statute when necessary to protect a defendant's constitutional right to a fair trial. (See, e.g., *People v. Oliver* (1975) 46 Cal.App.3d 747, 751 [120 Cal.Rptr. 368] [judicial misconduct]; *People v. Davis* (1973) 31 Cal.App.3d 106, 109 [106 Cal.Rptr. 897] [unexpected absence of witness].) No published decision, however, has ever approved granting a new trial based on differential treatment of defendants. (See generally *People v. Belmontes* (1988) 45 Cal.3d 744, 810–813 [248 Cal.Rptr. 126, 755 P.2d 310] [disposition of codefendant's case is irrelevant to jury's determination at penalty phase of capital case].)

We specifically do not address whether a new trial could be granted on such a ground, an issue that would involve significant separation of powers considerations. Even assuming a new trial could be granted on such a ground, it is not justified here. Defendant Knoller and codefendant Noel were not similarly situated with regard to their dog Bane's fatal mauling of Whipple in the hallway of the apartment building where they all lived. The immediate cause of Whipple's death was Knoller's own conscious decision to take the dog Bane unmuzzled through the apartment building, where they were likely to encounter other people, knowing that Bane was aggressive and highly dangerous and that she could not control him. Bringing a more serious charge against the person immediately responsible for the victim's death was a permissible exercise of prosecutorial discretion, not grounds for a new trial.

V.   CONCLUSION AND DISPOSITION

In sum, the trial court abused its discretion in granting defendant Knoller a new trial on the second degree murder charge. That court erroneously concluded both that Knoller could not be guilty of murder, based on a theory of implied malice, unless she appreciated that her conduct created a high probability of someone's death, and that a new trial was justified because the prosecution did not charge codefendant Noel with murder. It is uncertain whether the trial court would have reached the same result using correct legal standards. Moreover, the Court of Appeal, in reversing the trial court's order, also erred, mistakenly reasoning that implied malice required only a showing that the defendant appreciated the risk of serious bodily injury. Under these circumstances, we conclude that the matter should be returned to the trial court to reconsider its new trial order in light of the views set out in this opinion.

The Court of Appeal's judgment is reversed and the matter is remanded to that court, with directions to return the case to the trial court for reconsideration of defendant Knoller's new trial motion in accord with the views expressed in this opinion.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

The petition of appellant The People for a rehearing was denied July 18, 2007.