Filed 7/23/25  P. v. Lindow CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JONATHAN FREDERICK LINDOW,<br><br>    Defendant and Appellant. | C100392<br><br>(Super. Ct. No. 22FE018800) |

This appeal involves two incidents, less than a month apart, in which defendant Jonathan Frederick Lindow drove while intoxicated.  He had previously been convicted of driving under the influence (DUI) on five separate occasions, and each time he was warned about the risks of drinking and driving.  After the first incident in this case,

1

defendant's aunt also warned him of the risks. The second incident resulted in defendant crashing his car into the back of a motorcycle, seriously injuring the driver of the motorcycle and killing the passenger.

A jury convicted defendant of murder and various DUI-related offenses. The jury also found that defendant personally inflicted great bodily injury, inflicted bodily injury on more than one victim, drove with a blood-alcohol concentration of 0.20 percent or more during the second incident, and drove with a blood-alcohol concentration of 0.15 percent or more during the first incident. The trial court sentenced defendant to state prison for an indeterminate term of 15 years to life plus a consecutive determinate term of five years.

Defendant now contends (1) the evidence is insufficient to support his murder conviction, (2) the jury was erroneously instructed on implied malice, and (3) defendant's trial counsel was ineffective in failing to request a clarifying instruction regarding implied malice and failing to object to portions of the prosecutor's closing argument purportedly containing misstatements of law.

We will affirm the judgment. The evidence is more than sufficient to support defendant's murder conviction, his instructional error claim is forfeited, and he has not carried his appellate burden of demonstrating ineffective assistance of counsel.

BACKGROUND

Defendant was convicted of DUI in 1990, 1991, 1999, 2004, and 2005. Each time, defendant was warned that drinking and driving is dangerous to human life and that he could be charged with murder if he disregarded the warning and someone died as a result.

After defendant's 2004 conviction, he participated in a six-month DUI safety course. After his 2005 conviction, he participated in an 18-month course. Both courses covered the danger to human life posed by drinking and driving. Although defendant testified that the courses were "monotonous" and "redundant," and claimed that the danger to human life "wasn't hit home like it should have been," he acknowledged that

he was required to watch "blood alley" type videos, which highlighted that death can result from drinking and driving. Defendant also admitted during cross-examination that he knew drinking and driving endangered human life.

In 2022, defendant lived with his aunt in Sacramento. He was recently divorced, had lost his job, and sold his house after falling behind on mortgage payments. Defendant drove his aunt's car because his truck was involved in an accident before he moved in with her. Defendant admitted he was drinking too much during that time period.

The first DUI incident involved in this appeal occurred on October 14, 2022. An officer pulled defendant over at about 7:20 p.m. for speeding and failing to signal a lane change. The officer noticed an open container of beer in the driver's door compartment and two unopened containers of beer on the front passenger seat. The officer smelled the odor of alcohol coming from defendant. Defendant initially claimed he had opened the beer and took a sip, but that was the only alcohol he consumed that day. He then told the officer he drank a beer about two hours earlier. Defendant eventually admitted he had been drinking for six hours. The officer conducted various field sobriety tests, all of which indicated that defendant was intoxicated. Three preliminary alcohol screening tests, administered between 7:20 and 7:35 p.m., indicated a blood-alcohol concentration of more than twice the legal limit. The officer arrested defendant for DUI. Defendant's blood was drawn at the police station at about 9:10 p.m. Analysis of that sample revealed a blood-alcohol concentration of 0.20 percent, indicating that defendant had "approximately 8 drink equivalents in [his] system at that time."

After that arrest, defendant's aunt yelled at him for drinking and driving, specifically saying that he "put himself and everyone else at risk" by doing so, and that he could have "hurt somebody." Defendant acknowledged she was correct, admitting he was "stupid" and "shouldn't have done that."

3

Less than a month later, on November 9, 2022, defendant drove his aunt's car to an office for a new job in Vacaville. He had a couple drinks at the office and a couple more on his way back to his aunt's house, where he continued drinking. After his aunt went to bed, defendant drove to a gas station to get gas so that he would not have to do so the next morning before work. He also delivered food for DoorDash, a food delivery service. He received a notification for a nearby delivery and decided to accept it. Defendant delivered the order at 10:45 p.m.

About four minutes after delivering the order, defendant drove into the back of a motorcycle at the intersection of Greenback Lane and Hazel Avenue. The motorcycle's driver was J.B. His wife, Lindsay Crawford, was seated behind him. The motorcycle's headlights, brake lights, and running lights were fully operational. Visibility that night was clear. J.B. stopped at a red light at Greenback and Hazel. The light turned green as defendant approached the motorcycle from behind at about 45 miles per hour. Defendant did not see the motorcycle and did not brake as he approached. As J.B. shifted the motorcycle into gear and began accelerating into the intersection, defendant slammed into the back of it, sending J.B. flying through the air, and crushing Crawford. J.B. suffered serious injuries and was transported to the hospital. Crawford died at the scene.

When a responding officer approached defendant, he had red and watery eyes. He smelled of alcohol and was swaying and slightly slurring his speech while talking to the officer. Defendant claimed he had three beers and a glass of wine that night. The officer conducted various field sobriety tests, all of which indicated defendant was intoxicated. Two preliminary alcohol screening tests, administered at 11:21 and 11:24 p.m., indicated a blood-alcohol concentration of nearly three times the legal limit. The officer arrested defendant for DUI. Defendant's blood was drawn at the police station at about 12:40 a.m. Analysis of that sample revealed a blood-alcohol concentration of 0.231 percent, indicating that defendant had "approximately 10 drink equivalents in his system" at the time.

4

After the arresting officer learned of defendant's prior DUI convictions, he asked defendant whether he was ever warned that "driving a motor vehicle while intoxicated is dangerous and if you hit somebody, you can kill somebody . . . ." Defendant answered: "Yup." Although defendant testified he did not know what he meant by that because he was "intoxicated and in shock" at the time, defendant later testified repeatedly that he knew drinking and driving was dangerous to human life.

DISCUSSION

I

Defendant contends the evidence is insufficient to support his murder conviction.

"In reviewing a claim for sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] We review the entire record to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible and of solid value—supporting the decision and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] Our application of this standard of review does not permit reweighing the evidence or reevaluating the credibility of witnesses. [Citation.] Instead, we presume the existence of every fact the jury reasonably could have deduced from the evidence in support of the judgment. [Citation.] We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. [Citation.] And if the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Murphy* (2022) 80 Cal.App.5th 713, 725 (*Murphy*).)

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a).)[1]  Malice may be express or implied.  (§ 188, subd. (a).) Express malice exists when there is a deliberate intent to kill, whereas implied malice exists "when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)

In *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), the California Supreme Court held that a defendant who proximately causes a death while driving under the influence of alcohol may properly be charged with implied malice murder where the defendant, "knowing that his [or her] conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Id*. at p. 296.)  There, after becoming heavily intoxicated at a bar, the defendant drove through a red light, narrowly avoiding a collision with one car, drove away from that near collision at a high rate of speed, and then collided with another car, killing two people.  (*Id*. at pp. 293-294.)  Rejecting the defendant's assertion that a vehicular homicide may only be prosecuted as manslaughter, the court explained that "when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied.  [Citation.]  In such cases, a murder charge is appropriate." (*Id*. at p. 298.)  The court then explained that the following evidence supported two murder charges against the defendant:  he was legally intoxicated; he drove his car to the bar and must have known that he would have to drive it later; he presumably was aware of the

---

[1] Undesignated statutory references are to the Penal Code.

6

hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and the near collision suggested that he was actually aware of the risk. (*Id*. at pp. 300-301.)

"Since *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. [Citations.] These opinions have generally relied on some or all of the factors that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' [Citation.] However, 'courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach.' [Citation.]" (*People v. Suazo* (2023) 95 Cal.App.5th 681, 692-693; see *Murphy, supra*, 80 Cal.App.5th at p. 727.)

Here, defendant's blood-alcohol concentration, nearly three times the legal limit, indicates he was intoxicated. With respect to predrinking intent to drive, defendant drank alcohol at work knowing that he needed to drive back to his aunt's house, drank some more on his way there, and then continued drinking at the house. Although there is no indication that he specifically intended to drive later that night, as opposed to deciding at the last minute to get gas and make a food delivery, the record supports a reasonable conclusion that drinking and driving is something that defendant did as part of his regular routine. Defendant also knew the dangers of driving under the influence of alcohol. He was convicted of DUI five separate times. Each time, he was warned about the dangers of driving under the influence, including the risk to human life. Defendant admitted as much during his testimony at trial. And although those prior DUI convictions occurred many years ago, defendant was arrested for DUI three weeks before the fatal crash and his aunt reminded him quite forcefully that his actions placed his life and the lives of others at risk. Finally, although defendant was not speeding at the time of the crash, he drove into the back of a motorcycle in a major intersection on a clear night without seeing

7

the motorcycle or attempting to brake until the moment of collision, also suggesting that defendant was significantly impaired. Viewed in the light most favorable to the judgment, the evidence is sufficient to support a conclusion that defendant engaged in conduct that was dangerous to human life, with knowledge of the danger, and "nonetheless act[ed] deliberately with conscious disregard for life." (*Watson, supra*, 30 Cal.3d at p. 296; see also *Knoller, supra*, 41 Cal.4th at p. 152.)

Defendant's argument to the contrary is unavailing. He first cites a different formulation of the implied malice standard, i.e., that his "act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).) That formulation is commonly referred to as the *Thomas* test, as it "originated in Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470." (*Knoller, supra*, 41 Cal.4th at p. 152.) Defendant argues that his conduct did not satisfy that test because "compared to the number of arrests for drunk driving, the number of fatalities related to alcohol are relatively few." However, after quoting from defendant's preferred formulation of the standard, the *Reyes* court also quoted this line from Justice Liu's concurrence in *People v. Cravens* (2012) 53 Cal.4th 500 (*Cravens*): " 'Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible.' " (*Reyes,* at p. 989.) That is all that "high degree of probability" means in this context. And, as the California Supreme Court has also repeatedly stated, notwithstanding the different wording, the *Thomas* test is the functional equivalent of the formulation that we previously applied to the facts of this case, i.e., that implied malice exists "when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Knoller,* at p. 152

8

["these two definitions of implied malice in essence articulate[] the same standard"]; see also *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104.)

For the reasons already expressed, the evidence is sufficient to support a conclusion that defendant acted with implied malice. The prospect of killing someone while driving under the influence of alcohol is "more than remote or merely possible." (*Cravens, supra*, 53 Cal.4th at p. 513 (conc. opn. of Liu, J.).) Defendant knew of the danger to human life and chose to drive while intoxicated.

## II

Defendant also claims the jury was erroneously instructed on implied malice. But he did not object to the implied malice instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects [the] defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927; see *People v. Burton* (2018) 29 Cal.App.5th 917, 923.) Here there was no error or miscarriage of justice.

The jury was instructed on the crime of second degree murder with a version of CALCRIM No. 520 that was current at the time, but has subsequently been amended. The instruction began by informing the jury: "To prove the defendant is guilty of this crime the People must prove that, one, the defendant committed an act that caused the death of another person and, two, when the defendant acted he had a state of mind called malice aforethought." With respect to implied malice, the instruction informed the jury: "The defendant had implied malice if, one, he intentionally committed the act. Two, the natural and probable consequences of the act were dangerous to human life. [¶] Three, at the time he acted he knew his act was dangerous to human life. [¶] And, four, he deliberately acted with conscious disregard for human life." That formulation of implied malice is a correct statement of the law. (*Knoller, supra*, 41 Cal.4th at p. 152; *People v.*

9

*Fay* (2024) 101 Cal.App.5th 767, 774 [CALCRIM No. 520 correctly defines implied malice]; *People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092 [same].)

Nevertheless, defendant argues the jury should have been instructed in the language of the *Thomas* test, i.e., that the act committed must involve a high degree of probability that death will result. He claims that after the California Supreme Court's decision in *Reyes, supra*, 14 Cal.5th 981, such language is now an element of implied malice. Not so.

*Reyes* involved an appeal from the denial of a section 1172.6 petition. The court held that the trial court should not have found Reyes guilty of implied malice murder. (*Reyes, supra*, 14 Cal.5th at p. 984.) Reyes and a group of fellow gang members, one of whom was carrying a gun, rode their bicycles to the edge of rival gang territory, where they encountered a vehicle, and the person with the gun shot and killed the driver. (*Id*. at p. 985.) With respect to whether Reyes could be convicted of implied malice murder on a direct perpetrator theory, the court explained that the evidence was insufficient for two reasons. First, "it cannot be said that Reyes committed an act that 'proximately caused' [the victim's] death" because his cohort shot the victim and "no evidence was presented that Reyes's conduct was a 'substantial factor' that contributed to the shooting." (*Id*. at pp. 988-989.) Second, the court held the evidence was insufficient to support the trial court's conclusion that " '[t]he natural and probable consequences' of Reyes's act of traveling to rival gang territory with several other gang members, one of whom was armed, 'were dangerous to human life.' " (*Id*. at p. 989.) In that regard, the court stated: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*Ibid*., quoting *Knoller, supra*, 41 Cal.4th at p. 152.) The court held the evidence was insufficient to support a conclusion that Reyes committed such an act. (*Reyes,* at p. 990.)

*Reyes* did not purport to modify the legal definition of implied malice. The language quoted in that decision, derived from the *Thomas* test, accurately states the law. So does the language provided by the version of CALCRIM No. 520 given to the jury in this case. As stated previously, the two formulations of implied malice "in essence articulate[] the same standard." (*Knoller, supra*, 41 Cal.4th at p. 152.) However, in *People v. Dellinger* (1989) 49 Cal.3d 1212 (*Dellinger*), the court expressed concern "that juries might have difficulty understanding the *Thomas* test's concept of 'wanton disregard for human life,' [and] emphasized that the 'better practice in the future is to charge juries solely in the straightforward language of the "conscious disregard for human life" definition of implied malice,' " i.e., the language given to the jury in this case. (*Knoller,* at p. 152, quoting *Dellinger,* at p. 1221.) The trial court did not err in so instructing the jury.

The Judicial Council modified CALCRIM No. 520 after the *Reyes* decision to add the language defendant claims should have been given to his jury. In relevant part, the instruction now provides: "The defendant had implied malice if: [¶] . . . [¶] 2. The natural and probable consequences of the (act/ [or] failure to act) were dangerous to human life *in that the (act/ [or] failure to act) involved a high degree of probability that it would result in death*; . . ." (CALCRIM No. 520 (Mar. 2024 rev.), italics added.) But even if this addition to the instruction better articulates the implied malice standard for the jury, it remains true that the trial court did not err in giving the jury a legally correct instruction on implied malice, an instruction the California Supreme Court approved. (*Dellinger, supra*, 49 Cal.3d at p. 1221; see also *People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7 [jury instructions should not be cited as legal authority].) In any event, given the appellate record in this case, defendant has not established a miscarriage of justice.

Defendant argues in the alternative that even if the instruction was "technically correct, it was seriously misleading" and should have been modified to clarify that the danger to human life had to involve a high probability of death. However, "[a] party may

11

not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503 (*Hillhouse*).)  Defendant requested no such clarification, even though *Reyes* had been decided prior to his trial.  This assertion is therefore forfeited.

III

Defendant further asserts that his trial counsel provided ineffective assistance by failing to request a clarifying instruction based on *Reyes* and failing to object to portions of the prosecutor's closing argument purportedly containing misstatements of law about implied malice.

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.]  A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  [Citations.]  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  [Citation.]  Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 206-207.)

Beginning with defense counsel's decision not to request a clarifying instruction based on *Reyes*, as we have already explained, *Reyes* did not modify the legal definition of implied malice.  Reasonably competent counsel could have concluded that the version

12

of CALCRIM No. 520 given to defendant's jury still accurately articulated the standard and that clarification was unnecessary. Reasonably competent counsel could also have concluded that if he requested the " ' "high degree of probability" ' " language, the prosecution would have requested the full quotation from *Reyes*, including the following: " 'the probability of death from the act must be more than remote or merely possible.' " (*Reyes, supra*, 14 Cal.5th at p. 989.) That instruction would arguably have been worse for defendant. Stated differently, reasonably competent counsel could have concluded that the then-current version of CALCRIM No. 520 was both accurate and broad enough to allow for vigorous argument concerning whether or not defendant possessed implied malice. Defendant has not established that counsel's decision not to request clarification of the standard fell below an objective standard of reasonableness.

Turning to defense counsel's failure to object to the prosecutor's argument regarding implied malice, we first note that such a " 'failure to object will rarely establish ineffective assistance.' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1290, quoting *Hillhouse, supra*, 27 Cal.4th at p. 502.) This is because there are many reasons for an attorney to choose not to object to statements made during closing argument. (*People v. Avena* (1996) 13 Cal.4th 394, 421; see *People v. Anzalone* (2006) 141 Cal.App.4th 380, 395 [defense counsel "could reasonably have decided it was better to let the comment stand than risk irritating the jury by objecting"].)

Defendant claims "[t]he prosecutor stated incorrectly that (1) a dangerous act for implied malice purposes meant an act that might could possibly [*sic*] cause death, and (2) that an act was dangerous if it could cause bodily injury." (Italics omitted.) We disagree with defendant's characterization of the argument.

The prosecutor first said that defendant "knew the night of the collision that drinking and then driving is *dangerous to human life*, that he *could kill somebody*, and guess what he did it anyways." Later in the argument, the prosecutor acknowledged that defendant did not intend to kill anybody, and argued: "No, what [defendant] did that

13

evening was drink and drive. And he did it with implied malice. He knew the dangers. He knew the risks of what he was doing. He chose to do it anyways that is implied malice . . . ." The prosecutor continued: "This is really just common sense and that is we all know drinking and driving is dangerous to human life and can kill and hurt others." The prosecutor then emphasized that defendant was warned "over and over again" that "drinking and driving is dangerous." The prosecutor argued that defendant was warned about the danger after each prior DUI conviction, took the required classes, and was also warned by his aunt, "telling him don't drink and drive it's dangerous you'll kill somebody. [¶] And he admitted, himself, today before lunch that he knew these dangers and he did it anyways, that's disregard. That's an I don't care. I choose, I decide that I'm going to ignore those risks and do it anyways that's conscious disregard for human life." The prosecutor repeated four more times that defendant "did an act that was dangerous to human life," his actions were "dangerous to human life," the "natural and probable consequences of what he did was a danger to human life," and "drinking and driving is dangerous to human life." The prosecutor again emphasized the warnings defendant received: "If you're convicted three times, actually five times of DUI, there's gonna be five judges that tell you this advisement we talked about. The advisement that if you drink and drive, you could hurt somebody. You could kill somebody. You could be charged with murder if that happens."

No reasonable juror would have interpreted the prosecutor's argument to suggest that "the possibility of bodily injury was enough to convict [defendant] of murder." (Italics omitted.) The prosecutor clearly and repeatedly stated that drinking and driving was dangerous to human life. Although the prosecutor twice used the word "hurt" in addition to "kill," neither time did he remotely suggest that the danger of causing bodily harm was enough, by itself, to amount to implied malice. And defendant points this court to no specific language in the argument that can be read as suggesting that the mere possibility of death is enough. (See *Reyes, supra*, 14 Cal.5th at p. 989 [" 'the probability

14

of death from the act must be more than remote or merely possible' ”].)  The prosecutor's argument did not misstate the implied malice standard.  Defense counsel was not ineffective for failing to object.

DISPOSITION

The judgment is affirmed.


_____/S/_____<br>
MAURO, J.

We concur:


_____/S/_____<br>
EARL, P. J.


_____/S/_____<br>
HULL, J.