Filed 7/30/25  P. v. Ramirez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID MERINO RAMIREZ,<br><br>    Defendant and Appellant. | H052103<br>(Monterey County<br>Super. Ct. No. 20CR007123) |

In 2024, a jury found David Merino Ramirez guilty of various crimes stemming from a fatal accident he caused while driving under the influence of alcohol, including second degree murder and gross vehicular manslaughter while intoxicated.  The trial court sentenced Ramirez to 15 years to life in prison.

On appeal, Ramirez contends that the trial court erroneously instructed the jury regarding the necessary elements for implied malice murder by failing to modify the requisite instruction to reflect the language referencing a "high degree of probability" of death from *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), issued prior to his trial. Ramirez argues that the erroneous instructions constituted prejudicial error requiring reversal.

For the reasons discussed below, we find no instructional error and affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Procedural History*

On March 19, 2021, the Monterey County District Attorney's Office filed an information charging Ramirez with the murder of Noe Ramirez Santillan (Pen. Code[1], § 187, subd. (a); count 1); gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a); count 2); driving under the influence causing injury, with two or more prior convictions for driving under the influence (Veh. Code, §§ 23153, subd. (a) & 23566, subd. (a); count 3); driving under the influence causing injury with a blood alcohol level above 0.08 percent, with two or more prior convictions for driving under the influence (Veh. Code, §§ 23153, subd. (b) & 23566, subd. (a); count 4); and a misdemeanor count for driving when the privilege was suspended for a prior conviction for driving under the influence (Veh. Code, § 14601.2, subd. (a); count 5.) The information further alleged the following: (1) counts 1, 2, 3, and 4 were serious felonies within the meaning of sections 667.5, subdivision (c) and 1192.7, subdivision (c); (2) in the commission of counts 3 and 4, Ramirez personally inflicted great bodily injury on the victim (§ 12022.2, subd. (a)); and (3) as to count 4, Ramirez's blood alcohol level was 0.15 percent or higher (Veh. Code, § 23578).

On February 14, 2024, following a five-day trial, the jury found Ramirez guilty of murder (count 1), gross vehicular manslaughter while intoxicated (count 2), and misdemeanor driving when the privilege was suspended for a prior conviction for driving under the influence (count 5).[2]

---

[1] Undesignated statutory references are to the Penal Code.

[2] At the conclusion of evidence, the trial court instructed the jury that the charges in counts 3 and 4 were lesser included offenses to the gross vehicular manslaughter charge in count 2, and verdicts for these counts were only required if the jury did not find Ramirez guilty on count 2.

On April 11, 2024, the trial court sentenced Ramirez to the following: (1) 15 years to life in prison for second degree murder (count 1); (2) the middle term of six years for gross vehicular manslaughter (count 2), which was stayed pursuant to section 654; and (3) a concurrent term of 180 days in jail for misdemeanor driving when the privilege was suspended due to a prior conviction for driving under the influence (count 5). The court also granted the People's motion to dismiss counts 3 and 4 in the interests of justice and struck the associated enhancements with those counts.

Ramirez timely appealed.

## B. Factual Background

### 1. Prosecution's Case

#### a. August 21, 2020 car accident

On the night of August 21, 2020, witness J.C.[3] was driving on a road near the areas of Soledad and Greenfield in Monterey County when he observed parts of a vehicle in the middle of the road. He then saw a crashed, upside-down vehicle, and stopped to help. Upon approaching the vehicle, J.C. observed two occupants—a passenger and a driver, who J.C. later identified as Ramirez. J.C. broke the window of the car, which allowed Ramirez to get out of the car; however, J.C. saw that the passenger was "badly pinned" and "crushed" to the car. After Ramirez exited the car, J.C. noted that he seemed to appear drunk. Ramirez then made a phone call, and within ten minutes, a van came driving down the same road towards the accident. The van struck the upside-down vehicle without stopping, then came back and stopped. Ramirez then got into the passenger seat of the van and attempted to leave but could not do so as police had already arrived and closed off the road. After speaking with officers, J.C. confirmed that Ramirez was the driver of the crashed vehicle, as Ramirez had initially denied he had been driving.

---

[3] We refer to the civilian witness in the proceedings by his initials only to protect personal privacy interests pursuant to California Rules of Court, rules 8.90 (b)(10).

### b. Police Investigation

California Highway Patrol (CHP) Officer Fernando Sanchez testified that he was the first officer to arrive on the scene of the accident shortly after 9:00 p.m. on August 21, 2020. Upon contacting Ramirez, Sanchez observed that he had red watery eyes and the odor of alcohol on his breath. Sanchez also indicated that he communicated with Ramirez in Spanish on the scene, and did not observe that Ramirez had any trouble understanding him or speaking in Spanish.

CHP Officer Jordan Smith, who also responded to the scene, observed tire tracks coming from the left side of the road and continuing through to a dirt embankment on the side of the road. Smith concluded that the crash was most likely caused by the driver of the vehicle making an unsafe turning movement at a high speed, which subsequently resulted in the driver losing control. The event data recorder from the vehicle also reflected that the car's speed around the time of the collision was approximately 80 miles per hour, and that the antilock braking system did not engage, suggesting that the brake pedal had not been pressed during the crash.

Smith then spoke with Ramirez, who initially claimed that his brother Noe, the passenger in the car, had been the person driving, but later admitted that he (Ramirez) had been driving. Ramirez then indicated that he and Noe had been traveling northbound at the posted speed limit when another vehicle approached them from the southbound lane with its high beams activated. Noe then yanked the steering wheel, causing the car to crash.

Ramirez also admitted to Smith that he had consumed six beers prior to driving. Smith then conducted an investigation for driving under the influence, including a preliminary alcohol screening test, which yielded a positive result for the presence of alcohol. After arresting Ramirez, Smith then performed a standard breath alcohol test, which yielded a blood alcohol level result of 0.17 percent. Forensic scientist John Adam Lutz noted that at this level, which is more than double the legal limit, the level of

4

impairment to the person's mental facilities, small muscles, and large muscles would be significant, including but not limited to slurred speech, difficulty walking and maintaining balance, slower reaction times, and an inability to multitask.

Noe was pronounced deceased at the scene of the accident while still pinned inside the vehicle. Monterey County Detective Randal Dyck, who removed Noe's body from the vehicle, confirmed the cause of death as cervical spine fractures due to blunt force trauma.

### c. *Watson advisements*

In 2019, Ramirez pleaded no contest to two separate charges of driving under the influence of alcohol that took place in 2015 and 2019. At the time of Ramirez's plea, the court advised him pursuant to *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*) that driving under the influence was dangerous to human life, and if someone was killed as a result of Ramirez continuing to drive under the influence, he could be charged with murder. Ramirez was assisted by both Trique[4] and Spanish interpreters at his plea hearing, and the relevant plea forms were in Spanish, which he completed and initialed with the assistance of the Trique interpreter.

As part of his sentence for his two prior convictions, Ramirez enrolled in a DUI treatment program administered by Sun Street Centers. Sun Street staff confirmed that as part of the enrollment process, counselors reviewed enrollment forms with participants in person and arranged for interpreters if needed to ensure participants understood the forms being completed. These forms included a *Watson* advisement, and Sun Street staff confirmed that Ramirez was given *Watson* advisements on two separate occasions on December 26, 2019, and July 30, 2020.

---

[4] Trique is a language spoken in certain areas of Oaxaca, Mexico, where Ramirez was born and raised.

5

### 2. *Defense Case*

Ramirez, who testified in his own defense, indicated that he was born in Oaxaca, Mexico, and grew up speaking Trique. He stated that even after he immigrated to the United States, he still primarily spoke Trique and only learned a small amount of Spanish, and therefore could not have a "fluid" conversation with someone in Spanish. He further indicated that the staff at the Sun Street program only spoke to him in Spanish when completing his forms, and he did not understand everything being said or what he was signing.

Ramirez admitted that he was driving and under the influence of alcohol at the time of the accident. He indicated that he met up with Noe in the evening and consumed a total of ten beers to join Noe in celebrating his (Noe's) daughter's birthday. Ramirez indicated that prior to the incident, he had maintained his sobriety and was attending court-ordered classes.

After they drank, he began driving Noe's car on the backroads, but stopped briefly, at which point Noe took over and drove. When Noe, who was also drunk, was unable to keep the car straight in a single lane, Ramirez offered to drive again. After Ramirez took over, Noe began looking at his phone and tried to show Ramirez what appeared to be either a video or photo, then grabbed Ramirez's hand when another car approached them with its high beams on. The steering wheel began to move back and forth, and Ramirez then remembered pressing a pedal very hard before everything suddenly went dark. When Ramirez woke up, he was hanging in his seatbelt from the car, which was upside down, and Noe was asking him if he was all right. Ramirez recalled someone breaking the car and helping him get out, but did not fully remember his subsequent conversation with this person. While he believed he asked for help to get Noe out, and called 911, he could not confirm that he did. Ramirez did not recall seeing a van on the scene or getting inside the van.

6

## II.   DISCUSSION

Ramirez contends that his conviction should be reversed because the trial court did not provide the jury with the proper instructions for second degree implied malice murder.  Specifically, Ramirez argues that the trial court should have modified CALCRIM No. 520—the relevant jury instruction for second degree murder—to include the *Reyes* definition of the phrase "dangerous to human life" to mean "a high degree of probability that the act in question will result in death" in the context of implied malice, particular since CALCRIM NO. 520 was modified in March 2024 to include this definition.  Ramirez therefore claims that because this definition was not included in the prior version of CALCRIM No. 520 given to the jury, the jury failed to find that his act was dangerous to human life.

### A.   *Relevant Jury Instruction*

At the conclusion of evidence, the trial court instructed the jury with the version of CALCRIM No. 520 regarding first or second degree murder with malice aforethought, as it existed as of February 2024, as follows:

"The defendant is charged in Count 1 with murder in violation of Penal Code section 187.  [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1A. The defendant committed an act that caused the death of another person; and [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] … [¶]

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant had express malice if he unlawfully intended to kill.  [¶]  The defendant had implied malice if: [¶]  1. He intentionally committed the act;  [¶]  2. The natural and probable consequences of the act were dangerous to human life; [¶]  3. At the time he acted, he knew his act was dangerous to human life; [¶]  and 4. He deliberately acted with conscious disregard for human life.

7

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.  [¶] … [¶]  An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  [¶]  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  [¶] … [¶]

"If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521."

The record reflects that prior to instructing the jury, the court asked the parties if they had any objection to CALCRIM No. 521, to which both counsel responded they did not.

## B.    *Applicable Law and Standard of Review*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)  We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid.*)

If a trial court incorrectly instructs on an element of a charged offense such that the error impermissibly shifted or lowered the burden of proof for that element, the applicable standard of prejudice is the *Chapman* standard.  (See *Rose v. Clark* (1986) 478 U.S. 570, 570–581.)  Under the *Chapman* standard, a federal constitutional error requires

reversal unless the People show the error was "harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## C.   *Analysis*

### 1.   *Forfeiture*

Ramirez claims that even though he did not raise an objection to CALCRIM No. 520 at trial, any such objection would have been futile as the new version of CALCRIM No. 520 was only published after his trial.  Further, Ramirez claims that the post-*Reyes* modification of CALCRIM No. 520 affected his substantial rights by increasing the prosecution's burden of proof for implied malice murder, and he may therefore raise his claim of error for the first time on appeal.

The Attorney General argues that Ramirez has failed to demonstrate his substantial rights were affected by the instructional error because *Reyes* did not raise or alter the standard for implied malice, but simply articulated a standard from prior case law such that there was no instructional error.  In addition, the Attorney General notes that Ramirez failed to ask for any additional or clarifying language defining the term "dangerous to human life," despite the fact that *Reyes* had been decided eight months prior to his jury trial.

"The appellate court may . . . review any instruction given …, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; *People v. Thomas* (2023) 14 Cal.5th 327, 382.)  We agree with Ramirez that the claimed error involves a substantial right, and therefore shall consider the claim on its merits despite Ramirez's failure to raise it below.

### 2.   *No Error in The Challenged Instruction*

#### a.   *Implied Malice Murder*

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice "may be express or implied." (§ 188, subd. (a).)  "Malice is implied when no considerable provocation appears, or when the circumstances attending the

killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).) "Implied-malice murder has a physical component: an act whose natural consequences are dangerous to life. And it has a mental component: defendant's deliberate performance of the act with conscious disregard for life, knowing the act endangers another's life." (*In re Ferrell* (2023) 14 Cal.5th 593, 604.)

"[M]alice may be implied when a person drives a motor vehicle under the influence of alcohol and kills someone." (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1005 (*Lagunas*); *Watson*, *supra*, 30 Cal.3d at pp. 300–301.) "Since *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. [Citations.] These opinions have generally relied on some or all of the factors that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' [Citation.] However, 'courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach.' " (*People v. Suazo* (2023) 95 Cal.App.5th 681, 692–693 (*Suazo*); accord *Lagunas*, *supra*, 97 Cal.App.5th at p. 1005.)

As noted by both parties in their briefs, California courts have historically used two different formulations for the definition of implied malice as follows: (1) " 'an act, the natural consequences of which are dangerous to human life,' and (2) " ' "an act [committed] with a high probability that it will result in death[.]" ' " (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103–104, 110–111 (*Nieto Benitez*), quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587 (*Phillips*) and *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*).) However, the California Supreme Court has indicated on a number of occasions that these two tests are equivalent and reflect the same standard. (See, e.g., *Watson, supra,* 30 Cal.3d at p. 300; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219 [reaffirming the finding in *Watson* that the two standards for implied malice "articulated

10

one and the same standard"]; *Nieto Benitez, supra,* 4 Cal.4th at p. 104.)  Years later, in *People v. Knoller* (2007) 41 Cal.4th 139, 157 (*Knoller*), the California Supreme Court noted that to the extent the two tests in *Phillips* and *Thomas* differed, courts should instruct juries utilizing the language in *Phillips*.  The *Knoller* court concluded that the *Phillips* test more accurately described the subjective component of the test—namely, whether the defendant acted with a conscious disregard to human life—and did not require the defendant to be aware that his or her conduct carried a high probability of causing death.  (*Knoller, supra,* 41 Cal.4th at p. 157.)

In the 2023 case of *Reyes, supra,* 14 Cal.5th 981, the California Supreme Court provided clarification on the meaning of the term "dangerous to human life."  The court noted that "to suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' [Citations.]" (*Id.* at p. 989.)  As a result, CALCRIM No. 520 was revised in March 2024 to incorporate the definition of "dangerous to human life" into the elements required for a finding of implied malice as follows: "The defendant had implied malice if: [¶]  1. (He/She) intentionally (committed the act/ [or] failed to act); [¶]  2. The natural and probable consequences of the (act/[or] failure to act) were dangerous to human life *in that the (act/[or] failure to act) involved a high degree of probability that it would result in death*; [¶]  3. At the time (he/she) (acted/[or] failed to act), (he/she) knew (his/her) (act/[or] failure to act) was dangerous to human life; [¶]  and 4. (he/she) deliberately (acted/[or] failed to act) with conscious disregard for (human/[or] fetal) life."  (Italics added.)

### b.  Actus Reus

Ramirez argues that in *Reyes,* the California Supreme Court "squarely" addressed the high probability of death language by clearly stating that the term "dangerous to life" was the same as "a high degree of probability that the act in question will result in death." Ramirez argues that because this clarifying language was not contained in the version of

11

CALCRIM No. 520 given to the jury in his case, the jury was "free to define for himself or herself what constituted danger to human life." Ramirez therefore argues that jurors could have concluded a small or moderate probability of causing death was sufficient to meet this definition, which does not meet the burden of proof articulated under *Reyes* and therefore mandates reversal.

We disagree with this contention. As the Attorney General notes, the *Reyes* decision did not involve a jury instruction issue. Instead, *Reyes* concerned the sufficiency of evidence for the trial court's denial of a petition for resentencing under section 1172.6. (*Reyes, supra,* 14 Cal.5th at p. 984.) Accordingly, the California Supreme Court's discussion of the elements of implied malice were related to its conclusion that the defendant's conduct of traveling into rival gang territory was insufficient to give rise to a high probability that death would result. (*Reyes, supra,* 14 Cal.5th at p. 989.) However, the court provided no indication that its ruling therein abrogated or called into question its prior decisions in *Nieto Benitez, Dellinger,* or *Knoller* finding that the "high probability" and "natural consequences" standards of implied malice are the same, and that it would be proper to instruct the jury solely using the latter.

Further, we find no indication in the court's decision that its finding regarding the sufficiency of the evidence denying a section 1172.6 resentencing petition amounted to a holding or mandate that trial courts must include the additional language regarding a high probability of causing death when instructing on implied malice murder. Indeed, the decision would strongly suggest otherwise based on the court's language approving its prior conclusion in *Knoller* that "under the objective component of implied malice, " ' "dangerous to life" ' " means the same thing as a " 'high degree of probability that' " the act in question " 'will result in death.' " (*Reyes, supra*, 14 Cal.5th at p. 989, citing *Knoller, supra*, 41 Cal.4th at p. 152.)

Additionally, the *Reyes* decision does not reflect that the Supreme Court criticized or suggested any modifications to CALCRIM No. 520. In its sole reference to the

12

instruction, the court merely stated that CALCRIM No. 520 "alone . . . does not encompass the elements of *aiding and abetting* implied malice murder as set out in [*People v. Powell* [(2021) 63 Cal.App.5th 689]." (*Reyes*, *supra*, 14 Cal.5th at p. 991, italics added.) In any event, " 'jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7; *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

In summary, because we conclude that *Reyes* does not address or support Ramirez's claim for instructional error, we will not depart from the binding precedent from the holdings cited above finding no distinction between the standards for "high probability" and "natural consequences." Accordingly, we find no error in the actus reus element of the implied malice instruction given by the trial court at Ramirez's trial.

### c. Mens Rea

"For malice to be implied, a defendant must be subjectively aware that their acts or omissions endangered the life of" the victim. (*People v. Collins* (2025) 17 Cal.5th 293, 321 (*Collins*).) In the version of CALCRIM No. 520 given to the jury in Ramirez's trial, the trial court instructed the jury that the mental component of implied malice murder required proof beyond a reasonable doubt that "[a]t the time [the defendant] acted, he knew his act was dangerous to human life."

Ramirez acknowledges that the post-*Reyes* revisions to CALCRIM No. 520 did not modify the requirements for the subjective component of implied malice. However, he suggests that we "opine" on whether this element should be modified to include language stating that "dangerous to human life" means an awareness that the act involved a high probability that it would result in death. He argues that without such a modification, there is a "disconnect" between the mental state and act required for implied malice murder that could result in a jury finding the mental state satisfied simply from some awareness that an act is dangerous to human life—even if that danger is only

13

slight. He therefore argues that the mens rea element would remain one "in name only" if the same clarifying language about being "dangerous to human life" is not added to CALCRIM No. 520.[5]

The California Supreme Court has repeatedly distinguished between the two components of implied malice murder by emphasizing that the actus reus element is an objective standard, while mens rea is a subjective one. (See *Knoller*, *supra*, 41 Cal.4th at p. 157; see also *Collins*, *supra*, 17 Cal.5th at p. 322, citing *Reyes*, *supra*, 14 Cal.5th at p. 989.) For example, in *Knoller*, the trial court granted a new trial to a defendant who had been convicted of second degree murder on an implied malice theory, and based its ruling on a finding of insufficient evidence that the defendant subjectively knew "her conduct involved *a high probability of resulting in the death of another*." (*Knoller*, *supra*, 41 Cal.4th at p. 142, italics added.) The Supreme Court reversed this ruling as erroneous because subjective knowledge of the high probability of death is not an element of implied malice. (*Id*. at p. 157.) The court instead determined that " 'high probability of death' " is part of the objective component of implied malice, not the subjective component. (*Ibid*.)

As discussed above, the Supreme Court's decision in *Reyes* did not overrule *Knoller*. We therefore find no merit to Ramirez's contention that the trial court erred in instructing the jury on the subjective mens rea element of implied malice murder, as set forth in CALCRIM No. 520, without including clarifying language regarding the term "dangerous to human life."

---

[5] It is unclear whether Ramirez is simply arguing that CALCRIM No. 520 should be modified in general, or is specifically claiming that the trial court erred in his case by not including this clarifying language in its instructions to the jury regarding the required mental state for implied malice murder. In any event, for the reasons discussed *infra*, we find no instructional error.

### 3. *Harmless Error*

Even if we assume that the trial court erred in not modifying the previous version of CALCRIM No. 520 in the manner suggested by Ramirez, we find such error was harmless under the *Chapman* standard.

According to Ramirez's own testimony at trial, he admitted that he had been driving and consumed ten beers prior to driving. His blood alcohol level was 0.17 percent, which was more than twice the legal limit of 0.08 percent. Ramirez also testified that the steering wheel had been moving back and forth, and that he could not remember which pedal he pressed before everything "went black." Further, investigation from the scene of the accident and the event data recorder included: (1) the direction of the tire tracks from the left side of the road through to the dirt embankment; (2) the car's speed of approximately 80 miles per hours around the time of the collision; and (3) the antilock braking system not engaging. Such evidence provided overwhelming support for a jury to conclude that the crash was caused by Ramirez—the driver—making an unsafe turning movement at a high speed and losing control.

In addition, Ramirez had been convicted of two previous charges for driving under the influence in 2015 and 2019. Prior to entering guilty pleas of these charges, the trial court advised him, and Ramirez acknowledged, that driving under the influence was dangerous to human life, and if someone was killed as a result of Ramirez continuing to drive under the influence, he could be charged with murder. Ramirez also received the same written advisement on a number of occasions, including while completing his plea forms with the assistance of both Spanish and Trique interpreters, as well as during the completion of his enrollment forms with the Sun Street Center staff in December 2019 and July 2020. Evidence of prior reckless and/or drunk driving tends to establish a "defendant's *knowledge*—gained in the course of the prior misconduct—of the natural consequences, dangerous to life, of the reckless operation of a motor vehicle, and of his

15

persistence in that behavior, thus evidencing a conscious disregard for the lives of others on the road." (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 111–112.)

Moreover, Ramirez's claim that he did not properly understand this advisement because it was only given to him in Spanish, which was not his native language, or "via a rather chaotic chain of simultaneous interpretation," was not supported by the record and evidence presented at trial. The record reflected that Ramirez was given the advisement in Trique both verbally in court when he entered his plea, as well as twice in writing when completing his plea forms; further, Ramirez did not present any credible evidence that he misunderstood the *Watson* advisements he received in Trique.

Accordingly, after considering the jury instructions as a whole and the evidence presented at trial, and given the presence of all the factors identified in *Watson*, we conclude that any error in giving the challenged instruction was harmless because it is evident beyond a reasonable doubt that the jury would have still found Ramirez guilty of implied malice murder despite the purported error. (See *Suazo*, *supra*, 95 Cal.App.5th at pp. 692–693; *Lagunas*, *supra*, 97 Cal.App.5th at p. 1005.)

### III.    DISPOSITION

The judgment is affirmed.

16

_____
                                    Wilson, J.

WE CONCUR:


_____
         Danner, Acting P. J.


_____
         Bromberg, J.


*People v. Ramirez*
H052103