Filed 8/15/25  P. v. Romero CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICENTE DAVID ROMERO,<br><br>    Defendant and Appellant. | D085994<br><br><br><br>(Super. Ct. No. SWF2007390) |


APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed and remanded with directions to correct abstract of judgment.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Roges and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Vicente David Romero of second degree murder (Pen. Code,[1] § 187, subd. (a)) and other crimes after he provided Kelsey King with a fatal dose of fentanyl. He appeals from the judgment, asserting there was not sufficient evidence to support the jury's finding that he acted with implied malice and that the jury was improperly instructed.[2] Finding no error, we affirm the judgment and remand the case for correction of the abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We focus our summary of the facts primarily on the evidence relevant to the implied malice contentions on appeal.

In June 2020, Romero lived as part of the Temecula transient community. On or around June 15, 2020, Romero purchased six "M30" blue pills from someone named Greg. He previously purchased methamphetamine from Greg, but admitted it was the first time he purchased M30 pills from him. When he purchased the blue pills, Romero believed they contained fentanyl and stated he had twice previously overdosed or nearly overdosed on similar pills.

Romero attested that he did not believe an overdose was a medical emergency but rather becoming "too high" followed by a lengthy period of unconsciousness. He also testified that he used "oxycodone M30 pills" "five, six times," was aware that his pills were counterfeit oxycodone pills, and believed his pills contained fentanyl. Romero understood the pills to be laced with fentanyl because the first person to sell him M30 pills told him as much.

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    Romero also highlights that the abstract of judgment lists the wrong date of conviction. We order the abstract of judgment corrected accordingly.

Nevertheless, Romero confirmed that he could not tell by looking at an M30 pill if it was genuine or counterfeit.

Benedict G., another transient, reported that in the days leading up to June 16, he declined an invitation from Romero to sell fentanyl, advising him that fentanyl kills people. On June 16, Benedict shared his methamphetamine with Romero and Kelsey before selling Romero additional methamphetamine. When Benedict left them, he did not observe Kelsey to be in pain or experiencing any medical issue.

Romero, Kelsey, and a third person consumed the methamphetamine he purchased from Benedict. Romero testified that he and Kelsey agreed something was off about the methamphetamine and that both of them developed a headache. Romero offered Kelsey a share of one of his M30 pills to help with her headache, a remedy he had previously used. When he made the offer, he understood Kelsey had previously used heroin, but had not previously used M30 pills. He asserts he told her they were "strong," but believed that they would not "hurt" her because of her reported drug history. Although he believed there was fentanyl in the pills and that fentanyl was stronger than heroin, Romero claimed he did not know fentanyl was dangerous.

Romero described the pill he shared with Kelsey as physically different from the pills he previously consumed, finding them to be shinier and more difficult to crush. Ultimately, Romero ingested one-half of the crushed pill and Kelsey consumed the remainder. Romero testified that his headache began to feel better within a few minutes, and that he and Kelsey spoke briefly before he passed out.

When Romero awoke hours later, he was half-naked and another man was putting a shirt on him. He located his misplaced glasses and backpack

3

before looking for Kelsey. Romero discovered her face down "like she was praying" and was unable to rouse her. Romero sought assistance, explaining he and Kelsey ingested fentanyl. Responding police officers followed Romero's directions to Kelsey, finding her cold and stiff to the touch, kneeling in the fetal position. Officers could not detect a pulse and determined Kelsey was deceased.

While he received medical care for his own reaction, Romero explained that he knew Kelsey had never taken M30 pills before but he believed she could handle it because of her reported drug history.

The forensic toxicologist determined Kelsey died due to a combination of heroin, methamphetamine, and fentanyl. She had a low level of norfentanyl, a metabolite of fentanyl, in her system when she passed, indicating she died shortly after consuming fentanyl. The toxicologist opined that Kelsey ingested heroin within one or two days before her death.

Law enforcement officers discovered the remaining five blue M30 pills in Romero's backpack. A study of those pills confirmed they contained fentanyl. The criminalist who tested those pills explained that about 95 percent of the M30 pills she analyzed contained fentanyl, while only approximately five percent were oxycodone pills.

A sheriff's department investigator testified as an expert in fentanyl, summarizing the illicit fentanyl market in the county. He explained that fentanyl is sold in pills and powder form, and that counterfeit M30 pills were the primary source of fentanyl overdose deaths in Riverside County in 2020 and 2021. He opined that a quarter of a single M30 pill could be lethal. Further, he offered that it was common knowledge counterfeit M30 pills contained fentanyl. The expert explained that the fentanyl dosage in each pill varied, even among a single batch, likening the fentanyl to the number of

4

chocolate chips in a chocolate chip cookie.  As he explained, fentanyl works almost instantaneously to slow respiration and heart rate, which may result in death.

Over defense counsel's objection, the court provided CALCRIM No. 520 regarding the elements of murder.  The instruction stated in relevant part:

> "The defendant is charged in Count One with murder in violation of Penal Code section 187.  To prove that the defendant is guilty of this crime, the People must prove that:
>
> 1. The defendant committed an act that caused the death of another person
>
> AND
>
> 2. When the defendant acted or failed to act, he had a state of mind called malice aforethought.
>
> There are two kinds of malice aforethought, express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.
>
> The defendant had *express malice* if he unlawfully intended to kill.
>
> The defendant had *implied malice* if:
>
> 1. He intentionally committed the act or failed to act;
>
> 2. The natural and probable consequences of the act or failure to act were dangerous to human life;
>
> 3. At the time he acted or failed to act, he knew his act or failure to act was dangerous to human life;
>
> AND
>
> 4. He deliberately acted or failed to act with conscious disregard for human life."

The court also instructed the jury with a version of CALCRIM No. 252 which described second degree murder as a specific intent crime, requiring the intentional commission of the prohibited act and the specific intent or mental state explained in CALCRIM No. 520. Counsel contended the phrase, "dangerous to human life," in CALCRIM No. 520 was "unconstitutionally vague."

During deliberation, the jury sought clarification from the judge on the fourth element of CALCRIM No. 520. The court directed the jury back to CALCRIM Nos. 520 and 200 (an instruction regarding legal meanings and plain meanings of words and phrases). The jury deliberated for approximately one day and returned a verdict finding Romero guilty of murder in the second degree. Counsel renewed his objection to CALCRIM No. 520 following the jury's verdict.

In accordance with the jury's findings, the court sentenced Romero to a term of 15 years to life.

DISCUSSION

Romero challenges whether substantial evidence supports his conviction for murder and contends that his conviction must be overturned on a purported instructional error. We disagree.

1.    Sufficiency of the Evidence

Romero first argues that the finding he acted with malice is not supported by substantial evidence. Specifically, he challenges whether consuming counterfeit M30 pills objectively carried with it a high probability of resulting in death and whether the People proved he subjectively believed the pills to be dangerous.

When sufficiency of the evidence is challenged on appeal, we determine whether the record discloses substantial evidence from which, considered as a

6

whole, a reasonable trier of fact could conclude that the crime was committed as charged. (See *People v. Truong* (2017) 10 Cal.App.5th 551, 555–556.) We view the evidence in the light most favorable to the judgment and presume every fact in support of the judgment that the jury could have reasonably deduced from the evidence. (*Id*. at p. 556.) Substantial evidence is "evidence that is reasonable, credible and of solid value." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies to our review of circumstantial evidence. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) The testimony of a single witness, if believed by the finder of fact, can constitute sufficient evidence. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885.) When two or more inferences can reasonably be deduced from the facts, we do not substitute our deductions for those of the trier of fact. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144–145.)

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).) Malice may either be express, i.e., when a defendant manifests an intention to kill, or implied. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.) "To support a finding of second degree murder based on implied malice, the evidence must establish that the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger." (*People v. Superior Court* (*Chagolla*) (2024) 102 Cal.App.5th 499, 514.) Thus, implied malice involves

7

an objective component—an intentional act endangering the life of another—and a subjective component—knowledge and disregard of the danger. (*People v. Clements* (2022) 75 Cal.App.5th 276, 299.) Implied malice does not require an intent to kill. (*People v. Swain* (1996) 12 Cal.4th 593, 602.)

### a. Objective High Probability of Death

Romero claims the People failed to show "furnishing another with half of a crushed up illicit M30 pill sold on the street" involves a "high probability" of causing death. He challenges whether the evidence offered was appropriately temporally limited and whether they provided enough evidence of fentanyl's lethality. We conclude, however, that the People introduced ample evidence regarding the lethality of unregulated street fentanyl at the time of Kelsey's death. It follows that sharing unregulated street fentanyl with another, in this case via illicit M30 pills, involves a high probability of causing death.

An expert in fentanyl described the physical effects of ingesting fentanyl and the speed with which it could kill. He opined that a quarter of a counterfeit M30 pill—half the dose Kelsey consumed—could kill someone. He also described the prevalence of such pills in the surrounding community. Against that background, the expert explained that counterfeit M30 pills were the primary cause of fentanyl overdoses in the year Romero shared his pill with Kelsey. A reasonable trier of fact could take this testimony together and find that furnishing one-half of an illicit M30 pill known to contain fentanyl involved a high probability of death.

### b. Subjective Knowledge

Romero repeatedly stated that he believed the illicit M30 pills he purchased contained fentanyl but disavowed any knowledge that fentanyl

8

was dangerous or deadly. He testified that he did not believe that half of a pill would kill someone or make them sick, even though he twice overdosed on similar pills. That is, Romero believed he had twice overdosed on pills containing fentanyl, even though he had only ingested the pills "five, six times." He stated that he believed overdoses to consist of getting too high and becoming unconscious for prolonged periods. He claimed he did not believe overdoses to constitute a medical emergency or were otherwise dangerous.

However, Romero made assertions that cut against his expressed understanding of the dangers of illicit M30 pills. He told the court that he thought it would be "safe" for Kelsey to consume just half of the pill because it was less likely that she would get "hurt." It follows that he understood the pills he shared could cause harm. He believed, because of her prior heroin use, that Kelsey would be able to handle the fentanyl he offered to her. This indicates he understood certain conditions made ingesting one of the pills he purchased more, or less, dangerous. He admitted knowing fentanyl was stronger than heroin, a drug he understood to be dangerous.

Romero knew Kelsey had not used M30 pills before, so he warned her that the pills were "strong." He gave Kelsey half of a pill to prevent her from getting "hurt" or "too high." By his own reported definition of the word, Romero gave Kelsey just half of a pill because he did not wish for her to overdose.

Benedict also testified that, in the days or hours leading up to Kelsey's death, he told Romero fentanyl kills people. Nevertheless, Romero furnished a pill he believed to contain fentanyl, a drug he understood bore risk including the risk of death, to Kelsey, killing her.

9

With that evidence before them, a rational trier of fact could conclude Romero acted with conscious disregard for human life when he provided Kelsey with one-half of an illicit M30 pill.  Accordingly, we conclude substantial evidence supports a finding that Romero acted with implied malice.

2.    Instructional Error

Romero further contends his conviction for second degree murder must be reversed because the jury did not receive additional instruction regarding when an act is "dangerous to human life."  He argues "[t]he omission of the *Reyes* definition of 'dangerous to human life' rendered CALCRIM No. 520 unconstitutionally vague, lowered the prosecution's burden of proof, and violated [Romero's] constitutional right to a jury determination of all facts required for conviction."  (*People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).)

The trial court correctly instructed the jury on the elements of murder using CALCRIM No. 520.  The instruction properly informed the jury that the People must prove malice aforethought as a necessary murder and correctly defined both express and implied malice.  The court also instructed the jury that when the People were required to prove something, they were required to do so beyond a reasonable doubt.

The Supreme Court rejected the same argument Romero makes here in *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110–111 (*Nieto Benitez*) and *Knoller, supra*, 41 Cal.4th 139.

The defendant in *Nieto Benitez* argued that CALJIC No. 8.31[3] "misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that death will result." (*Nieto Benitez, supra*, 4 Cal.4th at p. 111.)  The Supreme Court disagreed and concluded that the instruction correctly distilled applicable case law.  (*Ibid.*)  In reaching this conclusion, the court noted it had previously concluded in *Watson* "that the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Nieto Benitez,* at p. 111.)

In *Knoller*, the trial court granted a new trial to a defendant convicted of second degree murder on an implied malice theory, finding insufficient evidence that the defendant subjectively knew her conduct involved a high probability of resulting in the death of another. (*Knoller, supra*, 41 Cal.4th at p. 142.)

Romero highlights that his case came to trial after *Reyes* was decided. He argues that the jury should have received further instruction on the objective component of implied malice.  In doing so, he seems to suggest *Reyes* impliedly overruled *Nieto Benitez* and *Knoller*.  We disagree.  There, the court was reviewing a trial court's denial of a petition for resentencing under section 1172.6.  The Supreme Court concluded that there was insufficient evidence to support a theory that the defendant was guilty of murder as a

---

3     The version of CALJIC No. 8.31 given in *Nieto Benitez* stated in relevant part:  " 'Murder of the second degree is [also] the unlawful killing of a human being when:  [¶] 1.  The killing resulted from an intentional act, [¶] 2.  The natural consequences of the act are dangerous to human life, and [¶] 3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.' "  (*Nieto Benitez, supra*, 4 Cal.4th at p. 100.)

direct perpetrator who harbored implied malice. The court based its decisions primarily on the lack of substantial evidence of probable cause, but it also took issue with the trial court's conclusion that the defendant's conduct was " 'dangerous to human life.' " The Supreme Court explained: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*Reyes, supra*, 14 Cal.5th at p. 989, quoting *Knoller, supra*, 41 Cal.4th at p. 152.) The court found that the defendant's conduct in traveling to rival gang territory with other gang members did "not by itself give rise to a high degree of probability that death will result." (*Reyes*, at p. 989.)

*Reyes* did not involve a jury instruction issue and the court did not suggest that either *Nieto Benitez* or *Knoller* was wrongly decided. The *Reyes* court's reference to the "high probability of death" standard in deciding a sufficiency of the evidence question under section 1172.6 does not amount to a holding that trial courts must include such language in the jury instructions defining implied malice. (*Reyes, supra*, 14 Cal.5th at pp. 989-990.) *Reyes* did not call into question the Supreme Court's own prior holdings that the "high probability" and "natural consequences" standards of implied malice are the same, or that instruct solely on the latter was proper. (*Nieto Benitez, supra*, 4 Cal.4th at p. 111.) Because the Supreme Court in *Reyes* did not decide this issue and did not overrule or otherwise disapprove of its own precedent, we remain bound by its decisions in *Nieto Benitez* and *Knoller*. We

12

therefore find no error in the implied malice instruction given at Romero's trial.[4]

## DISPOSITION

The judgment is affirmed. The trial court is directed to amend the abstract of judgment to correctly reflect Romero's date of conviction and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


O'ROURKE, Acting P. J.

I CONCUR:


KELETY, J.

---

[4] We recognize that since Romero's trial, CALCRIM No. 520 has been modified to state in relevant part: "The natural and probable consequences of the (act/[or] failure to act) were dangerous to human life *in that the (act / [or] failure to act) involved a high degree of probability that it would result in death.*" (Italics added.) In making this modification, however, the CALCRIM committee did not suggest that it was legal error to give the prior version, the substance of which was approved in *Nieto Benitez*.

CASTILLO, J., Dissenting.

I respectfully dissent, as I disagree substantial evidence supports the subjective component of implied malice. No record evidence supports finding Vicente David Romero knew giving Kelsey King the other half of the M30 pill he had already ingested endangered her life. (See maj. opn., at pp. 9-10.)

"[A] conviction for second degree murder, based on a theory of implied malice, requires proof that a defendant acted with conscious disregard of the danger to human life." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.) The subjective component requires evidence the defendant "knows that his [or her] conduct endangers the life of another." (*Id.* at p. 143 [cleaned up].) For example, in *People v. Tseng* (2018) 30 Cal.App.5th 117, 129-131, sufficient evidence of the subjective component existed because the physician defendant (1) "had expert knowledge of the life-threatening risk posed by her drug prescribing practices" and (2) continued to prescribe stronger medications with no medical justification despite knowing her other patients with "similar patient profiles" had died.

Such evidence is lacking here. Nothing in the record indicates Romero knew half of this M30 pill could kill. For example, there is no evidence (1) the dealer warned Romero either (a) these M30 pills were particularly strong or lethal or (b) others had died after taking the pills, and (2) despite this knowledge, Romero gave Kelsey half of the M30 pill anyway. In the past, it took ingesting "two or three pills" for Romero to overdose and pass out for "like a day or two." Based on his understanding of the pill's strength and because he knew Kelsey had never used it before, Romero suggested she "take it slow" by "just do[ing] half." Romero ingested the first half of the pill before offering the remainder to Kelsey.

1

In short, Romero gave Kelsey four to six times *less* than the quantity of pills that had previously caused him nonlethal harm. The only reasonable inference I can draw from this evidence is that Romero was *not* aware giving Kelsey half a pill endangered her life. Though Romero was told fentanyl "kills people," this general statement does not change Romero's subjective understanding of the relative strength, and corresponding danger, of the M30 pill at issue here.

Yet on this same evidence, the majority concludes Romero understood the pill could "cause harm" and "certain conditions made ingesting one of the pills he purchased more, or less, dangerous." (Maj. opn., at p. 9.) Each move Romero took, however, reflects a conscious attempt to *reduce* the danger to Kelsey. At most, it could indicate Romero was aware half of one pill could *injure* her. But as our Supreme Court has determined, to permit a conviction of second degree murder based on a defendant's knowledge the conduct risked causing serious bodily injury "set[s] the bar too low." (*Knoller*, 41 Cal.4th at p. 143.) Implied malice requires "awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Ibid.*) As I discern no evidence of that requisite awareness here, I must depart from the majority.

Instead, I would reverse Romero's conviction of second degree murder, which would in turn make it unnecessary to reach his claim of instructional error. When, as here, insufficient evidence supports the conviction for a greater offense, we may modify the judgment to reflect a conviction for a lesser included offense. (*People v. Navarro* (2007) 40 Cal.4th 668, 671, citing Pen. Code, §§ 1181(6) & 1260.) The parties agree such modification would be appropriate here, and so do I. I would thus modify the judgment to reflect a conviction for the lesser included offense of involuntary manslaughter—an

2

unlawful killing without malice (*People v. Thomas* (2012) 53 Cal.4th 771, 813-814)—and remand for a full resentencing.


CASTILLO, J.