Filed 12/1/25  P. v. Bahena CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ANGEL SANTOS BAHENA,<br><br>        Defendant and Appellant. | C100386<br><br>(Super. Ct. No. 22FE008690) |

In 2024, a jury found defendant Angel Santos Bahena guilty of various crimes including second-degree murder stemming from a fatal accident he caused while driving under the influence of alcohol.  The trial court sentenced defendant to 15 years to life plus six years.

On appeal, defendant contends the trial court prejudicially erred in instructing the jury regarding the implied malice element of murder by failing to modify the instruction to reflect the "high degree of probability of death" language from *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).  We find no instructional error.

1

Defendant also contends his sentence of 15 years to life for gross vehicular manslaughter while intoxicated must be reversed because the prior conviction enhancement (Pen. Code, § 191.5, subd. (d) [statutory section citations that follow are to the Penal Code unless otherwise stated]) did not apply.  The People agree, as do we.  We will strike the enhancement and remand to the trial court to resentence defendant on this count.

## FACTS AND HISTORY OF THE PROCEEDINGS

On May 15, 2022, at about 6:40 a.m., Mycajoy P. and her parents, Nelson and Marilyn P., were driving to church in their SUV on Elder Creek Road.  (Hereafter, we identify the family members by their first names.)  Mycajoy was driving, Nelson was in the front passenger seat, and Marilyn was in the back middle seat.  All three were wearing seatbelts.  It was a sunny day; the weather was clear.

The family drove towards the traffic light at the intersection of Elder Creek Road, an east-west city street, and Florin Perkins Road, a north-south street.  As they approached the intersection at a speed of 40 to 45 miles per hour, the light was green.  When they were almost past the middle of the intersection, a car traveling at a speed of 45 miles per hour ran the red light, striking the SUV on the driver's side and pushing it over a fence into a field.  Defendant, the driver of the car, got out of his car and lay on the ground.

Inside the SUV, Nelson had lost consciousness.  When Mycajoy was able to wake him, her father asked what happened.  Nelson could not move because of the pain in the left side of his body.  Mycajoy's feet were trapped under the pedals.  She felt pain in her left side, on her hip and in her back.  Marilyn's eyes were closed and she was leaning on the left side of the car.  Mycajoy tried to wake Marilyn but she would not move.  Mycajoy called 911 on her father's phone.

Two men came to the aid of the family. The driver's side door was too damaged to open, so the men forced the passenger side door open and helped Mycajoy and Nelson out. Marilyn's seatbelt was locked and had to be cut to remove her from the back seat. Her breathing was shallow and her pulse was weak.

Law enforcement and medical personnel arrived at the scene. CPR performed on Marilyn—initially by one of the men who pulled her out of the SUV and then by medical personnel—was unsuccessful. Marilyn died at the place of the accident.

Officers questioned defendant, who first said he was going home and then said he was going to a convenience store. Defendant was taken to UC Davis hospital. At about 8:00 a.m., a police detective questioned defendant. She had been informed that defendant was involved in a vehicle collision, and it was suspected defendant was driving under the influence (DUI). The detective smelled an odor of alcohol coming from defendant and noticed he had watery eyes. Defendant stated he drank three beers from 8:00 p.m. to 9:00 p.m. the previous night. Defendant denied ingesting drugs.

The detective administered two breath tests. The results were 0.114 percent blood-alcohol at 8:14 a.m. and .109 at 8:17 a.m. (Two breath tests administered to Mycajoy a little after 9:00 a.m. both recorded zero percent alcohol content.) When the detective requested defendant submit to a blood chemical test, he declined, arguing he had already had a breath test. When reminded he was required to submit to the blood test as a condition of probation from a prior DUI conviction, defendant's blood was drawn at 9:39 a.m. The results indicated a blood-alcohol content of .117 percent. There was also a positive result for cocaine.

In October 2023, defendant was charged with murder (§ 187, subd. (a); count one); gross vehicular manslaughter (§ 191.5, subd. (a); count two); causing bodily injury while under the influence of alcohol (Veh. Code, § 23153, subd. (a); count three); and causing bodily injury while driving with a blood-alcohol content of .08 percent or greater (Veh. Code, § 23153, subd. (b); count four). The information alleged, as to count two,

defendant had a prior conviction for violating Vehicle Code section 23152, subdivision (b) in 2012 within the meaning of section 191.5, subdivision (d), and, as to counts three and four, defendant personally inflicted bodily injury (§ 12022.7, subd. (a)) and proximately caused bodily injury to more than one victim in one instance of driving in violation of Vehicle Code section 23153 (Veh. Code, § 23558).

Defendant's case was tried to a jury. At trial, Chris Fogelberg, a criminalist, testified as an expert in forensic toxicology and the effects of consumption of alcohol and drugs on the human body. Fogelberg testified the blood sample obtained from defendant contained cocaine and benzoylecgonine, a metabolite of cocaine. Given that the time required for half of cocaine to be eliminated from the body is 40 minutes to an hour, Fogelberg testified the presence of cocaine in the blood sample indicated recent use. Fogelberg further testified that cocaine impairs the ability of a person to safely operate a car because it affects the ability to focus and concentrate. A person on cocaine could be confused, agitated, fidgety and restless, and might engage in high-risk behavior such as weaving in and out of traffic, speeding, and being distracted.

In terms of alcohol, responding to a hypothetical question from the prosecutor, Fogelberg calculated that it would be impossible for a male weighing 230 pounds to have a blood-alcohol content of .11 percent at 9:39 a.m. by drinking three beers between 8:00 and 9:00 the prior night. Based on an .11 percent blood-alcohol test result at 9:39 a.m., Fogelberg determined that, given the rate of elimination of alcohol from the bloodstream, the blood-alcohol content of the person at 6:38 a.m. would have been .17 percent.

Fogelberg opined that all people with .08 blood-alcohol are too impaired to drive. He also opined a person with blood-alcohol content of .17, .15, or .11 percent would be too impaired to drive. Fogelberg testified that the presence of cocaine, while a stimulant, would not counteract the depressant effects of alcohol: "instead, what you have is just an alert drunk."

The parties stipulated that in September 2012 defendant was convicted of violating

4

Vehicle Code section 23152, subdivision (b), and certified records of defendant's conviction were admitted in evidence. As required by Vehicle Code section 23953, an advisement below defendant's signature on the plea form read: " 'You are hereby advised that being under the influence of alcohol or drugs, or both, impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If you continue to drive while under the influence of alcohol or drugs, or both, and as a result of that driving someone is killed, you can be charged with murder.' " (*People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*) [a defendant who proximately causes a death while driving under the influence of alcohol may be charged with implied malice murder where the defendant, "knowing that his [or her] conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life"].)

In December 2021, defendant pleaded no contest to a charge of violating Vehicle Code section 23103.5, referred to on the plea form as a "wet 2nd." Certified records of defendant's prior conviction were admitted in evidence. The trial court suspended sentence and placed defendant on informal probation for one year. The parties stipulated defendant was on probation on May 15, 2022. The trial court's order in 2021 stated: "Do not drive a motor vehicle with any drugs or any measurable amount of alcohol in your system. Do not refuse to complete [a] blood alcohol chemical test when offered by any peace officer with reasonable cause to do so." The court also ordered defendant to enroll in the "SB-38" program. (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 110 & fn. 3 [SB-38 is a mandatory program, whose name is derived from legislation requiring multiple drunk-driving offenders to attend classes on the dangers of drinking and driving].)

Defendant testified on his own behalf at trial. He admitted pleading no contest to a DUI in 2012 and having to take classes. Defendant testified that he did not read the advisory below his signature on the 2012 plea form, and his lawyer did not go over it

5

with him.  Defendant also admitted to pleading no contest to a "wet reckless charge" in 2021.  He testified the plea hearing was over Zoom, and he had some problems with his connection.  Defendant said he did not understand his plea but knew his license would be suspended.  Defendant said he was not required to take any classes as a result of this plea.

Regarding the May 2022 collision, defendant testified he took his 11-year-old daughter to a quinceanera at 8:00 or 9:00 p.m. the previous night.  He stayed an hour or two and had one beer.  He went home but came back to help clean up the hall, arriving about 11:00 p.m. or 12:00 a.m.  He stayed an hour or two but did not drink.  He went to the house of Phil, the friend who invited him to the quinceanera, arriving at about 1:00 a.m.  They went to a bar at about 1:30 a.m., had a beer, and left right away with a friend Michael and his wife, whom they met there.  They arrived at Michael's house at about 2:00 a.m.  Defendant drank beer and Crown Royal.  Defendant only drank three shots of whiskey because he does not like liquor.  Defendant testified he might have done cocaine, but it must have been a small amount because he did not remember it.  Defendant tried to go to sleep but he was tossing and turning.  He got up around 5:00 or 6:00 a.m.  Defendant told Phil he was ready to go home and dropped him off at his home in South Sacramento on Florin Road

Defendant was not feeling the effects of alcohol and thought it was safe to drive his car.  He drove on Florin Road to Florin Perkins Road to go home.  Defendant remembered approaching the intersection and seeing a yellow light; after that he was knocked out.  When he regained consciousness, he could not breathe because of the airbags.  He tried to open the door and realized his wrist was broken.  Defendant opened the door and fell out due to a hip injury.

On cross-examination, defendant testified that, after his 2012 conviction, he attended a first offender DUI class for three months.  Defendant did not remember what he learned in class.  Defendant agreed that driving under the influence of alcohol is dangerous "to a certain point," depending on the level of intoxication.  Defendant agreed

6

that driving over the legal limit for alcohol is dangerous, and he knew driving under the influence was dangerous at the time of his 2012 plea. Defendant testified that he did not know he was ordered to take classes after his 2021 plea and did not take any classes. Defendant thought that the trial court's order not to drive with any measurable amount of alcohol in his system meant his blood-alcohol content had to be below .08 percent. He was not aware he was ordered not to drive with "any measurable" amount of alcohol in his system.

The trial court instructed the jury on murder with CALCRIM No. 520, which states in relevant part: "The defendant, Angel Bahena, is charged in Count One with the murder of Marilyn [P.], in violation of Penal Code Section 187. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person, Marilyn [P.], and two, when the defendant acted he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought – express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant had express malice if he unlawfully intended to kill.

"The defendant had implied malice if, one, he intentionally committed the act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted he knew his act was dangerous to human life; and four, he deliberately acted with conscious disregard for human life."

The jury found defendant guilty on all counts and found all alleged enhancements true. The trial court sentenced defendant to a term of 15 years to life plus six years in state prison comprised of: 15 years to life on count one, 15 years to life on count two (stayed under section 654), the middle term of two years on count four as the principal determinate term with an additional three years for the allegation of bodily injury of Nelson and one year for bodily injury to another victim, Mycajoy, and the midterm of

7

two years on count three with additional four years for injury to the same victims (stayed under section 654).

Defendant appealed.

DISCUSSION

I

*Implied Malice Murder Jury Instruction*

Defendant contends the trial court prejudicially erred in instructing the jury on implied malice. But as the People point out defendant did not object to the malice instruction at trial or request additional, clarifying language. "Failure to object to instructional error forfeits the issue on appeal unless the error affects [the] defendant's substantial rights." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927; see also *People v. Burton* (2018) 29 Cal.App.5th 917, 923.) "[I]n general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in [the] law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' " (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428.)

Defendant acknowledges that the California Supreme Court's decision in *Reyes*—which defendant argues adopted "a high degree of probability of death" standard for implied malice—was issued in June 2023, several months before his trial. Defendant counters, however, that a claim of instructional error may be raised for the first time on appeal where the trial court failed to instruct on an essential element of the charged offense (*People v. Mil* (2012) 53 Cal.4th 400, 409) or misstated the elements of a crime (*People v. Nelson* (2016) 1 Cal.5th 513, 543). Defendant also asserts the error affected his substantial rights. (§ 1259; *People v. Thomas* (2023) 14 Cal.5th 327, 382.)

Assuming defendant's claim was preserved for appeal, we reject it on the merits.

8

The jury was instructed on second-degree murder with a version of CALCRIM No. 520 current at the time (though subsequently amended, as we will discuss).  That instruction informed the jury that defendant harbored implied malice "if, one, he intentionally committed the act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted he knew his act was dangerous to human life; and four, he deliberately acted with conscious disregard for human life." This formulation of implied malice is a correct statement of the law.  (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*); *People v. Fay* (2024) 101 Cal.App.5th 767, 774 [CALCRIM No. 520 defines implied malice correctly].)

Defendant, however, argues the jury should have been instructed with the test articulated in *People v. Thomas* (1953) 41 Cal.2d 470 (*Thomas*).  Under that test, implied malice exists where " 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*People v. Washington* (1965) 62 Cal.2d 777, 782 (*Washington*) [quoting Justice Traynor's concurring opinion in *Thomas*, at p. 480].)

Defendant acknowledges that the California Supreme Court held in *People v. Phillips* (1966) 64 Cal.2d 574 (*Phillips*) that malice is implied where a killing "proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (*Id.* at p. 587; *Knoller, supra*, 41 Cal.4th at p. 152 [this definition of implied malice is known as "[t]he *Phillips* test"].)  The California Supreme Court has repeatedly held that "the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111 (*Nieto Benitez*); see also *Watson, supra,* 30 Cal.3d at p. 300; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219 (*Dellinger*) [*Watson* "made it abundantly clear

9

that the two definitions of implied malice" in the *Phillips* test and the *Thomas* test "articulated one and the same standard"]; *Knoller, supra*, at p. 152 [same but endorsing the *Phillips* test].)

Nonetheless, defendant argues that, after the California Supreme Court's decision in *Reyes*, "only an act carrying a high degree of probability of death is sufficient for implied malice." Defendant thus asserts "the jury . . . was not correctly instructed concerning the fact that the danger to human life required a high degree of probability that the act would result in death, and there was nothing that informed jurors they had to make that factual finding." We disagree.

In *Reyes, supra*, 14 Cal.5th 981, the Supreme Court clarified the term "dangerous to human life": In order "to suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*Id*. at p. 989.) The *Reyes* decision, however, did not involve a jury instruction but the trial court's denial of petition for resentencing under section 1172.6. (*Reyes, supra*, at p. 984.) The Supreme Court's discussion of the elements of implied malice was in the context of its conclusion that the defendant's conduct of traveling into rival gang territory with other gang members, one of them armed, was insufficient to give rise to a high probability that death would result. (*Id.* at p. 989.) The court provided no indication that its ruling abrogated or questioned the validity of its prior decisions in *Watson, Nieto Benitez*, *Dellinger*, and *Knoller* concluding that the "high probability" and "natural consequences" implied malice standards are one and the same. Indeed, as noted, in *Dellinger*, the high court specifically approved the language in CALJIC No. 8.11 that was subsequently adopted in the version CALCRIM No. 520 given at defendant's trial. (*Dellinger, supra*, 49 Cal.3d at pp. 1221-1222.) Moreover, the *Reyes* court quoted with approval the language from *Knoller* reaffirming that "under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question

10

' "will result in death." ' " (*Reyes, supra,* at p. 989, quoting *Knoller, supra*, 41 Cal.4th at p. 152.) In short, the language quoted in *Reyes* from the *Thomas* test correctly states the law, but so does the *Phillips* test language in the version of CALCRIM No. 520 given the jury in this case. (*Watson, supra*, 30 Cal.3d at p. 300.)

Separately, defendant argues that a correct instruction after *Reyes* "would require the jury to find that the defendant knew his act carried a high degree of probability that it would result in death." As defendant acknowledges, however, in *Knoller, supra*, 41 Cal.4th 139, the California Supreme Court held that subjective knowledge of the high probability of death in the *Thomas* test is not an element of implied malice: high probability of death is the objective, not the subjective, component of implied malice. (*Id.* at p. 157.)

To be sure, as defendant notes, in March 2024, the Judicial Council modified CALCRIM No. 520 after the *Reyes* decision to add language defendant contends should have been given to the jury. The instruction now provides in relevant part: "The natural and probable consequences of the (act/ [or] failure to act) were dangerous to human life in that the (act/ [or] failure to act) involved a high degree of probability that it would result in death. . . ." (CALCRIM No. 520 (Mar. 2024 rev.).) Even if this addition to the instruction better articulates the implied malice standard for the jury, it remains true that the trial court did not err in giving the jury a legally correct instruction on implied malice, approved by California Supreme Court in *Nieto Benitez, supra*, 4 Cal.4th at pages 103-104; *Dellinger, supra*, 49 Cal.3d at pages 1221-1222; and *Knoller, supra*, 41 Cal.4th at page 152.

The trial court did not err in instructing the jury on implied malice.

11

II

*Gross Vehicular Manslaughter Sentencing*

Defendant contends there is insufficient evidence to support the allegation that he suffered a prior conviction within the meaning of section 191.5, subdivision (d), requiring imposition of a life term. He argues his 2012 conviction for violation of Vehicle Code section 23152, subdivision (b) was not one of the enumerated Vehicle Code sections punishable in section 191.5, subdivision (d). The People concede the issue and we agree. The evidence is undisputed that defendant's 2012 conviction under Vehicle Code section 23152, subdivision (b) alleged in the information was his first DUI offense and therefore not punishable under section 191.5, subdivision (d). Accordingly, there was insufficient evidence to impose a 15-years-to-life-sentence under section 191.5, subdivision (d).

Defendant was charged with a life-term sentence enhancement in count two of having suffered a prior DUI conviction in 2012 within the meaning of section 191.5. subdivision (d). As discussed above, at trial the parties stipulated that defendant was convicted in 2012 of a violation of Vehicle Code section 23152, subdivision (b) for driving a motor vehicle under the influence of alcohol. The People introduced evidence of defendant's order of informal probation and minute order in that case, in which a box was checked describing the violation as "23152(b) VC – First Offense." Defendant was also ordered to complete a three-month "1st Offender DUI Program." Defendant testified on cross-examination that he attended a first offender DUI class after his 2012 conviction and this was his first experience with the criminal court. In closing argument, the prosecutor twice referred to defendant's 2012 conviction as "his first offense."

The jury was instructed with CALCRIM No. 3100 on this charge, in pertinent part: "If you find the defendant guilty of the crime in Count Two, vehicular manslaughter while intoxicated with gross negligence, you must also decide whether the People have proved the additional allegation that the defendant was previously convicted

12

of another crime. It has already been determined that the defendant is the person named in Exhibit 6. You must decide whether the evidence proves the defendant was convicted of this alleged crime. [¶] The People allege that the defendant was convicted of, one, a violation of Vehicle Code section 23152(b), for which judgment was entered on September 5, 2012, in the Superior Court of the State of California for the County of Sacramento in case number 12T04139."

The jury found the enhancement true. The trial court sentenced defendant to 15 years to life on count two and stayed the sentence under section 654.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 483.)

Section 191.5, subdivision (a), defines the crime of gross vehicular manslaughter while intoxicated for which defendant was convicted in count two. Subdivision (d) of section 191.5 provides, "A person convicted of violating subdivision (a) who has one or more prior convictions of this section or of paragraph (1) of subdivision (c) of Section 192, subdivision (a) or (b) of Section 192.5 of this code, *or of violating Section 23152 punishable under Sections 23540, 23542, 23546, 23548, 23550, or 23552 of*, or convicted of Section 23153 of, the Vehicle Code, shall be punished by imprisonment in the state prison for a term of 15 years to life." (Italics added.)

Vehicle Code section 23540, subdivision (a), provides "If a person is convicted of a violation of Section 23152 and the offense occurred within 10 years of a separate violation of Section 23103, as specified in Section 23103.5, 23152, or 23153, that

resulted in a conviction, that person shall be punished by imprisonment in the county jail for not less than 90 days nor more than one year and by a fine of not less than three hundred ninety dollars ($390) nor more than one thousand dollars ($1,000). The person's privilege to operate a motor vehicle shall be suspended by the department pursuant to paragraph (3) of subdivision (a) of Section 13352. The court shall require the person to surrender the driver's license to the court in accordance with Section 13550." Vehicle Code section 23546 has similar language when a defendant has two convictions, and Vehicle Code section 23550 involves three or more convictions. Vehicle Code sections 23542, 23548, and 23552 require mandatory jail sentences or fines where probation is granted when a defendant had prior DUI convictions.

A Vehicle Code section 23152 conviction does not subject a defendant to increased punishment under Penal Code section 191.5, subdivision (d), unless the prior conviction is punishable under one of the enumerated code sections, e.g., Vehicle Code section 23540. (Pen. Code, § 191.5, subd. (d).) Here, the prosecution needed to prove for the section 191.5, subdivision (d), enhancement that defendant (1) had suffered a prior conviction of violating Vehicle Code section 23152; and (2) within the prior 10 years he had been convicted of one or more violations of Vehicle Code section 23152, 23103.5, or 23153 for which he was punished pursuant to Vehicle Code sections 23540, 23542, 23546, 23548, 23550, or 23552. Thus, in this instance, there must be multiple prior convictions for driving under the influence to qualify for punishment under section 191.5, subdivision (d) for a prior violation of Vehicle Code section 23152. The Legislature enacted section 191.5, subdivision (d), to increase the punishment for anyone convicted of gross vehicular manslaughter who had a *history* of driving under the influence. (See Stats. 1996, ch. 645, § 1) ["This act shall be known and may be cited as 'Courtney's Law' in memory of Courtney Cheney of Roseville, who was killed by a drunken driver with a long history of driving under the influence"].)

Since it is undisputed that defendant's 2012 conviction was his first DUI, he could

14

not have been punished under Vehicle Code sections 23540, 23542, 23546, 23550, or 23552.  Accordingly, there is insufficient evidence to support the jury's true finding on the enhancement to count two under section 191.5, subdivision (d).

We will order stricken the enhancement under section 191.5, subdivision (d) stayed under section 654 and remand the matter to the trial court with directions to conduct a full resentencing.  (*People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

## DISPOSITION

The enhancement under section 191.5, subdivision (d) is stricken and the sentence vacated.  We remand the matter to the trial court with directions to conduct a full resentencing.  The judgment is otherwise affirmed.


____/s/_____
HULL, Acting P. J.

We concur:


_____/s/_____
DUARTE, J.


_____/s/_____
MESIWALA, J.

15